**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF PENNSYLVANIA, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No: 5:20-cv-2299 |
| vs. | ) ) | |
| TOM WOLF, in his official capacity as Governor of the Commonwealth of Pennsylvania, et al. | ) ) ) ) | Judge Smith |
| | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.   **Facts Established by Testimony and Verified Complaint**

     A.  **Qualification Methods for Major and Minor Candidates**

    1.     To date, only the Republican Party and Democratic Party are classified as "Political Parties" (hereinafter "Major Parties") as defined by Pennsylvania statute.  Verified Complaint, R.1, at ¶ 3.

    2.     "Political Bodies" are organizations (hereinafter "Minor Parties") that did not have a candidate who crossed the two-percent threshold in the last election.  Verified Complaint, R.1, at ¶ 3.

    3.     Major Parties select their nominees by means of taxpayer-funded primary elections. Verified Complaint, R.1, at ¶ 4.

4.      Major Party candidates who win in the primary election automatically qualify for placement on the ballot in the general election. Verified Complaint, R.1, at ¶ 4.

5.      Political Bodies, that is, Minor Parties, are not able to participate in Pennsylvania's primary election. Verified Complaint, R.1, at ¶ 5.

6.      Minor Party candidates do not circulate nomination petitions, but rather, circulate nomination papers, in order to appear on the general election ballot. Verified Complaint, R.1, at ¶ 5.

7.      The signature requirement for Major Party candidates to appear on the primary election ballot is at most half of the signature requirement for those Political Body candidates running for the same office to appear on the general election ballot. Verified Complaint, R.1, at ¶¶ 7, 8, 9, 10.

8.      The first day for Major Party candidates to circulate and file nomination petitions was January 28, 2020 and the last day for Major Party candidates to circulate and file nomination petitions was February 18, 2020. Verified Complaint, R.1, at ¶ 31

9.      As the last day for Major Party candidates to circulate and file nomination petitions was February 18, 2020, and the emergency orders were not first announced until March 2020, the ability of Major Party candidates to obtain signatures was not impacted by Governor Wolf's stay at home orders. Verified Complaint, R.1, at ¶ 31; Stipulated Facts, R.35, at ¶¶ 44-59; Marks Testimony at 170-6 – 170-14; Henry Testimony at 59-9 – 59-16.

10.     The first day for Minor Party candidates to circulate nomination papers was February 19, 2020. Hearing Transcript, Testimony of Jonathan Marks (hereinafter "Marks Testimony"), at 153; Verified Complaint, R.1, at ¶ 32.

11.     The last day for Minor Party candidates to circulate and file nomination papers is August 3, 2020. Marks Testimony at 151; Verified Complaint, R.1, at ¶ 70.

12.     If a circulator obtains more than just the circulator's own signature, the signatures must be collected in-person, witnessed in-person, and delivered to elections officials in its original form so that copies are not permitted. Marks Testimony at 148, 171-2; Verified Complaint, R.1, at ¶ 68. Nomination papers that are signed, scanned and emailed are not permitted. Marks Testimony at 171-18 – 172-2.

13.     Nomination petitions and nomination papers must be printed on legal sized (8.5" x 14") paper and printed double sided and head-to-head, or they will not be accepted by the Secretary of the Commonwealth. *Libertarian Party of Pennsylvania v. Wolf*, No. 20-2299, Deposition of Jason Henry, June 25, 2020 (hereinafter "Henry Testimony"), at 56-8 – 56-16; Moore Testimony at 17.

14.     Until the filing of this lawsuit the Secretary of the Commonwealth was erroneously instructing Political Body candidates for the statewide offices of Attorney General, Auditory General and State Treasurer that they needed to obtain 2,500 signatures "including at least 250 from each of at least five counties." Hearing Transcript, Testimony of Jonathan Marks (hereinafter "Marks Testimony") at 171-12 – 171-17; Verified Complaint, R.1, at ¶9, Ex. A. That erroneous instruction was not corrected after this lawsuit was filed.  Stipulated Facts, R.35, at ¶ 31. B; Marks Testimony at 171-12 – 171-17.

15.     Pennsylvania has adopted the Pennsylvania Electronic Transactions Act, providing that electronic signatures must be given legal effect for purposes of most contracts and many other legal instruments. Verified Complaint, R.1, at ¶ 63.

3

16.     Although Pennsylvania has adopted the PA Electronic Transactions Act, all signatures for nomination petitions and nomination papers must be "wet" signatures. Marks Testimony at 149.  Pennsylvania does not allow for digital signatures for nomination petitions and nomination papers, *id*. at 148-49, 171-72, nor does it allow photocopies of "wet" signatures. *Id*.

### B.  The Plaintiffs Have Appeared on the Ballot in the Past

17.     The Libertarian Party of Pennsylvania, Green Party of Pennsylvania and Constitution Party of Pennsylvania were each qualified Minor Parties under Pennsylvania law in the 2002, 2004 and 2006 general election cycles. *See Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 353 (3rd Cir. 2014). Each party lost that status due to the unconstitutional enforcement of 25 Pa. Stat. Ann. §§ 2911(b) and 2937, which began in 2004 and extended until this Court held the provisions unconstitutional as applied in 2015. *See Constitution Party of Pa. v. Cortes*, 116 F. Supp. 3d 486 (E.D. Pa. 2015), *aff'd*, 824 F.3d 386 (3rd Cir. 2016).

18.     After obtaining relief from the unconstitutional enforcement of §§ 2911(b) and 2937, the Libertarian Party of Pennsylvania, Green Party of Pennsylvania, and Constitution Party of Pennsylvania once again began qualifying candidates for local, State, and federal offices in Pennsylvania's general elections, and they intend to run candidates for these offices in Pennsylvania's 2020 general election. *See Libertarian Party of Pennsylvania v. Wolf*, No. 20-2299, Transcript, Evidentiary Hearing, June 23, 2020 (hereinafter "Hearing Transcript"), Testimony of Jennifer Moore (hereinafter "Moore Testimony") at 8-9 (testifying that the Libertarian Party of Pennsylvania ran 18 candidates for office in Pennsylvania in the 2018 general election); Hearing Transcript, Testimony of Timothy Runkle (hereinafter "Runkle Testimony"), at 117 (Green Party will have a "full State slate, so that is your POTUS, your Attorney General, your Auditor General,

your State Treasurer.  And we also have two House -- Pennsylvania House candidates that are ready to go with campaigns."); Runkle Testimony at 117 (the Green Party has "put up candidates either in municipal elections or statewide elections consistently since early on in the beginnings of the Pennsylvania Green Party, and that would date to the early '90s."); Hearing Transcript, Testimony of Kevin Gaughen, (hereinafer "Gaughen Testimony") at 35-36 (testifying that in 2016 LPPA had 14 candidates that met the signature requirement to be placed on the General Election ballot and in 2018, the LPPA had 20 candidates that met the signature requirement to be placed on the General Election ballot); Gaughen Testimony at 81 (testifying that LPPA has successfully put candidates on the ballot for the positions of "President, Governor, Congress, State Rep, all sorts of local offices, municipal offices, town council, Auditor.").

## C.  The COVID-19 CRISIS AND PENNSYLVANIA'S RESPONSE

19.     On January 30, 2020, after the coronavirus outbreak had spread well beyond China, the World Health Organization declared that COVID-19 constitutes a Public Health Emergency of International Concern. Verified Complaint, R.1, at ¶ 29.

20.     On January 31, 2020, as a result of confirmed cases of COVID-19 in the United States, Health and Human Services Secretary Alex M. Azar, II declared a nationwide public health emergency retroactive to January 27, 2020.  Verified Complaint, R.1, at ¶ 30.

21.     On February 27, 2020, the Centers for Disease Control issued guidance recommending, among other things, that members of the public practice "social distancing" and minimize close contact with others in order to slow the spread of COVID-19. Verified Complaint, R.1, at ¶ 33.

22.     On March 11, 2020, the World Health Organization declared COVID-19 to be a global pandemic.  Verified Complaint, R.1, at ¶ 35.

23.     On March 13, 2020, the President of the United States declared a national emergency (retroactive to March 1, 2020) due to the COVID-19 outbreak in the United States. Verified Complaint, R.1, at ¶ 36.

24.     On March 23, 2020, Governor Wolf issued a mandatory stay at home order that was subsequently extended several times. Verified Complaint, R.1, at ¶ 38.

25.     The Governor's emergency orders placed all Counties in the Commonwealth under "red phase" restrictions, which permitted only life sustaining businesses to operate.  Verified Complaint, R.1, at ¶¶ 38-46.

26.     Social distancing was required in these red phase Counties and travel outside the home was restricted to life-sustaining purposes. Verified Complaint, R.1, at ¶¶ 38-46.

27.     All Counties were in the red phase until May 8, 2020, when the Governor signed an order that put the counties of Bradford, Cameron, Centre, Clarion, Clearfield, Clinton, Crawford, Elk, Erie, Forest, Jefferson, Lawrence, Lycoming, McKean, Mercer, Montour, Northumberland, Potter, Snyder, Sullivan, Tioga, Union, Venango and Warren in the yellow phase. Verified Complaint, R.1, at ¶¶ 50-51.

28.     Because of Governor Wolf's mandatory stay at home orders and his placement of all Counties in the Commonwealth under "red phase" restrictions, Plaintiffs were not legally allowed to physically collect wet signatures in-person from voters in Pennsylvania from March 23, 2020 until at the earliest May 8, 2020 and did not do so. Verified Complaint, R.1, at ¶¶ 57, 71; Moore Testimony at 12-13.; Runkle Testimony at 113.

29.     According to the Centers for Disease Control, older adults (particularly those over 65) and people of any age who have serious underlying medical conditions (including asthma, heart disease, cancer, and diabetes) may be at higher risk for severe illness from COVID-19. Verified Complaint, R.1, at ¶ 56.

### D. Plaintiffs Request Relief

30.     On March 30, 2020, Plaintiff GPPA, sent a letter to Governor Wolf, Lt. Governor John Fetterman, Secretary of the Commonwealth Kathy Boockvar, Deputy Secretary for Elections and Commissions Jonathan M. Marks, Speaker of the House Rep. Mike Turzai, and State and Government Committee chairs Rep. Garth Everett, Rep. Kevin Boyle, Sen. John Disanto, and Sen. Anthony Williams, urgently requesting that they grant relief from the petitioning requirements for minor parties and political bodies for the remainder of 2020.  Verified Complaint, R.1, at ¶ 73; Marks Testimony at 168-69.

31.     On March 31, 2020, Plaintiff LPPA sent a letter via U.S. Certified Mail to Secretary Kathy Boockvar, with a courtesy copy sent via U.S. Certified Mail to Governor Wolf, urgently requesting that they grant relief from the petitioning requirements for Minor Parties and Political Bodies for the remainder of 2020.   Verified Complaint, R.1, at ¶ 74; Marks Testimony at 168-69.

32.     On April 20, 2020, Plaintiff CPPA sent a letter to Governor Wolf, Lt. Governor John Fetterman, Secretary of the Commonwealth Kathy Boockvar, Deputy Secretary for Elections and Commissions Jonathan M. Marks, Speaker of the House Rep. Mike Turzai, and State and Government Committee chairs Rep. Garth Everett, Rep. Kevin Boyle, Sen. John Disanto, and Sen. Anthony Williams, urgently requesting that they grant relief from the petitioning requirements for minor parties and political bodies for the remainder of 2020.  To date, Plaintiff, CPPA has not

received a response from any of the aforementioned parties. Verified Complaint, R.1, at ¶ 75; Marks Testimony at 168-69.

33.     On April 29, 2020, Plaintiff LPPA sent a letter via U.S. Registered Mail to Governor Tom Wolf and Secretary Kathy Boockvar reiterating its urgent request for relief from the statutory provisions requiring the party to circulate nomination papers and obtain signatures by hand, similar to the relief obtained in *Libertarian Party of Illinois, et al. v. Pritzker*, No. 1:20-cv-02112, ECF No. 27 (N.D. Il. April 23, 2020).  To date, Plaintiff, LPPA has not received a response from any of the aforementioned parties, with the exception of the response from Timothy E. Gates, Chief Counsel for the Governor's Office of General Counsel, stating that their letter has been received. Verified Complaint, R.1, at ¶ 76; Marks Testimony at 168-69.

34.     On April 30, 2020, Plaintiff GPPA sent a letter to Governor Wolf, Lt. Governor John Fetterman, Secretary of the Commonwealth Kathy Boockvar, Deputy Secretary for Elections and Commissions Jonathan M. Marks, Speaker of the House Rep. Mike Turzai, and State and Government Committee chairs Rep. Garth Everett, Rep. Kevin Boyle, Sen. John Disanto, and Sen. Anthony Williams reiterating its urgent request for relief from the statutory provisions requiring the party to circulate nomination papers and obtain signatures by hand.  Verified Complaint, R.1, Exhibit F.  To date, Plaintiff, GPPA has not received a response from any of the aforementioned parties, with the exception of the response from Timothy E. Gates, Chief Counsel for the Governor's Office of General Counsel, stating that their letter has been received. Verified Complaint, R.1, at ¶ 77; Marks Testimony at 168-69.

35.     To date, neither Governor Wolf nor Secretary Boockvar have offered the Plaintiffs any relief from burdens of obtaining physical signature for the nomination papers to be placed on the general election ballot, and accordingly, all Political Body candidates are still required to obtain

the required number of physical "wet" signatures as mandated by Pa. Rev. Stat. § 2911(b), as modified by this Court's order in *Constitution Party v. Aichele,* No. 12-2726, Doc. No. 115 (E.D. Pa. February 1, 2018). Verified Complaint, R.1, at ¶ 78; Marks Testimony at 168-69.

36.    Defendants have not offered any substantive guidance to Political Body candidates as to how they may collect signatures safely during the COVID-19 pandemic, nor have Defendants offered Plaintiffs any relief from the Commonwealth's petitioning requirements as applied in the context of the COVID-19 pandemic.  Verified Complaint, R.1, at ¶¶ 78-79; Marks Testimony at 176-6 – 176-11;  Gaughen Testimony at 65 (stating that "I'm unfamiliar with a single order that the Governor put out that directly addresses petitioning," and that "If we had clarity [pertaining to the Governor's orders], we would not be here today"); *id*. at 59 (testifying that the Pennsylvania Association of Realtors "had to get clarification from the Governor because his orders were not clear about [what was permitted in the various phases]").

37.    Despite Defendants' failure to provide Plaintiffs with relief from Pennsylvania's petitioning requirements or guidance as to how Plaintiffs may safely petition during the COVID-19 pandemic, Governor Wolf issued an executive order extending the deadline for returning absentee and mail-in ballots during Pennsylvania's 2020 primary election. Marks Testimony at 169-5 – 170-5.

38.    The Governor has stated that law enforcement officials will fine those who violate his emergency orders: "[l]aw enforcement remains focused on achieving voluntary compliance through education, but citations are possible for violators depending on the specific circumstances of an investigation." Verified Complaint, R.1, at ¶ 57.

D. <u>Pennsylvania Adjusts Restrictions Between Phases</u>

37.     On May 15, 2020, the Governor moved the counties of Allegheny, Armstrong, Bedford, Blair, Butler, Cambria, Fayette, Fulton, Greene, Indiana, Somerset, Washington and Westmoreland into the "yellow phase." Governor Tom Wolf, Yellow Phase Orders Updated to Include 13 Additional Counties on May 15, governor.pa.gov/newsroom/yellow-phase-orders-updated-to-include-13-additional-counties-on-may-15/.

39.     On June 5, 2020, all remaining red phase counties moved to "yellow phase." Governor Tom Wolf, Reopening Phase Orders Updated to Include 10 Additional Counties Moving to Yellow and 16 to Green on June 5, governor.pa.gov/newsroom/reopening-phase-orders-updated-to-include-10-additional-counties-moving-to-yellow-and-16-to-green-on-june-5/.

40.     As of June 11, 2020, thirty-three counties are still in the yellow phase. *Id*. Pennsylvanians residing in these counties comprise "roughly 50 percent" of the Commonwealth's electorate. Marks Testimony at 173-7 – 173-19.

41.     In the yellow phase, the Governor ordered that if a non-life sustaining business has the capability of working remotely, it must continue to do so.  Verified Complaint, R.1, at ¶ 48.

42.     Under the Governor's May 7, 2020 Order, he directed that certain businesses in "yellow" counties may conduct in-person operations, "provided that the businesses fully comply with all substantive aspects of: the Order of the Secretary of Health providing for building and safety measures, issued April 5, 2020; the Order of the Secretary of Health providing for business safety measures (to keep employees and customers safe), issued April 15, 2020; and any other future applicable Department of Health (DOH) and Centers for Disease Control and Prevention (CDC) guidance." *See* Section 1.D. of Governor's May 7, 2020 Order, Exhibit 5, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

43.     The Governor also issued guidance titled "Guidance for Businesses Permitted to Operate During the COVID-19 Disaster Emergency to Ensure the Safety and Health of Employees and the Public" ("Business Guidance") which notes, among other things, that "[a]ll businesses in all industries and sectors of the economy (including non-profit entities) in the Commonwealth, which are permitted to conduct in-person operations, are subject to this guidance." See Business Guidance, Page 2, Exhibit 4, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

44.     In the yellow phase, people must still maintain a six-foot distance from others. Verified Complaint, R.1, at ¶ 49.

45.     In the yellow phase, "dine-in" restaurants are not permitted, but take-out is allowed. Verified Complaint, R.1, at ¶ 48.

46.     In the yellow phase, crowds of more than 25 people are not permitted.  Verified Complaint, R.1, at ¶ 48.

47.     As people were not permitted to gather in groups of more than 25 people, most, if not all, municipal or government planned Memorial Day festivities were canceled. Runkle Testimony at 110, 113, 122; Moore Testimony at 20.

48.     In the yellow phase, indoor recreation, health and wellness facilities or personal care services are not permitted.  See Process to Reopen Pennsylvania, Page 17, Exhibit 3, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

49.     In the yellow phase, no in-person retail is permitted. See Process to Reopen Pennsylvania, Page 17, Exhibit 3, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

50.     In the yellow phase, per the Governor's Business Guidance, businesses must provide non-medical masks for employees to wear at all times, or allow employees to wear their own masks.   *See* Business Guidance, Page 3, Exhibit 4, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

51.     In the yellow phase, businesses must discourage non-essential visitors from entering the business.  *See* Business Guidance, Page 3, Exhibit 4, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

52.     In the yellow phase, businesses must conduct business with the public by appointment only, whenever possible and that if it is not possible, a business must limit the number of people inside the building to no more than 50% of the maximum occupancy.  *See* Business Guidance, Page 3-4, Exhibit 4, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

53.     In the yellow phase, businesses must require all customers to wear a mask, unless the customer cannot wear a mask due to a medical condition. *See* Business Guidance, Page 4, Exhibit 4, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

54.     Governor Wolf stated, in a press conference, "I must emphasize that moving into the green phase will still require precautions to keep our communities and our families safe. Covid-19 continues to be a threat and, unfortunately, that won't change until we have a vaccine or a cure."  *See* Natasha Lindstrom, *What Moving into 'Green' Zone Does, Does Not Mean Under Gov. Wolf's Reopening Plan*, Pittsburgh Tribune (May 22, 2020) *available at*

https://triblive.com/news/pennsylvania/what-moving-into-green-zone-does-does-not-mean-under-gov-wolfs-reopening-plan/.

55.     In the green phase, businesses must still fully comply with all substantive aspects of previous Orders from the Secretary of Health and guidance from the Wolf Administration; the Department of Health; the Centers for Disease Control and Prevention; and all existing and future applicable guidance issued by the Wolf Administration. *See* Section 1. B. of Governor Wolf's May 27, 2020 Order, Exhibit 10, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

56.     In the green phase, teleworking is strongly encouraged by the Governor. *See* Section 1. B. of Governor Wolf's May 27, 2020 Order, Exhibit 10, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

57.     In the green phase, gatherings of more than 250 people for a planned or spontaneous event are prohibited.  *See* Section 1. G. of Governor Wolf's May 27, 2020 Order, Exhibit 10, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

58.     In the green phase, all businesses must provide non-medical masks for employees to wear at all times and make it mandatory to wear a mask while on the work site.  *See* Business Guidance, Page 3, Exhibit 4, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law. ("All businesses conducing in-person operations as permitted in *each* respective Phase must do the following…Provide non-medical masks for employees to wear at all times and make it mandatory to wear masks while on the work site.") (emphasis added).

59.     In the green phase, businesses must require all customers to wear a mask while on the premises. *See* Business Guidance, Page 3, Exhibit 4, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

60.     In the green phase Counties, people must still maintain social/physical distancing of six feet. ("In all phases, we must…keep our physical distance of six feet or more.") *See* May 4, 2020 Guidance for Business Permitted to Operate During the COVID-19 Disaster Emergency to Ensure the Safety and Health of Employees and the Public, (Updated July 1, 2020) *available at* https://www.governor.pa.gov/covid-19/business-guidance/.

61.     In the green phase, businesses that were conducting in-person operations during the yellow phase may operate at 75% of the maximum capacity stated on the certificate of occupancy and are required to enforce social distancing.  *See* Section 1. C. of Governor Wolf's May 27, 2020 Order, Exhibit 10, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

62.     In the green phase, businesses that were not conducting in-person operations during the yellow phase may operate at 50% of the maximum capacity stated on the certificate of occupancy and are required to enforce social distancing.  *See* Section 1. D. of Governor Wolf's May 27, 2020 Order, Exhibit 10, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

63.     In the green phase, with regard to bars and restaurants, standing at bars is not permitted and all customers must be seated and maintain social distancing of six feet or have a physical barrier between the customers, and only a maximum of four customers that "have a common relationship" may sit together at the bar.  *See* Guidance for Businesses in the Restaurant

14

Industry Permitted to Operate During the COVID-19 Disaster Emergency to Ensure the Safety and Health of Employees and the Public, as incorporated by reference in Section 1. E. i. in Governor Wolf's May 27, 2020 Order, Exhibit 10, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law (https://www.governor.pa.gov/covid-19/restaurant-industry-guidance/).

64.     In the green phase, Hair salons, barbershops and other personal care businesses must operate by appointment only and must operate under the 50% occupancy limit. *See* Process to Reopen Pennsylvania, Page 4, Exhibit 3, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

65.     In the green phase, health and wellness services, casinos, theaters, shopping malls and indoor entertainment must operate at or below the 50% occupancy limit and social distancing must be enforced.  *See* Process to Reopen Pennsylvania, Page 4, Exhibit 3, Appendix of Executive Order and Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

66.     Social distancing is still required for all businesses operating throughout Pennsylvania. Henry Testimony at 59-20 – 59-24.

67.     Per the Governor's Business Guidance, the Governor "has directed the following state agencies and local official to enforce orders relating to the COVID-19 pandemic to the *full extent* of the law" (emphasis added): Department of Health; Department of Agriculture; Department of Labor and Industry; Pennsylvania State Police; Local Officials, using their resources to enforce closure orders within their jurisdiction; and the Pennsylvania Liquor Control Board.  *See* Business Guidance, Page 5-6, Exhibit 4, Appendix of Executive Order and

Governmental Communication Exhibits to Parties' Joint Stipulated Findings of Fact and Conclusions of Law.

68.     People who attended recent protests in Pennsylvania violated the terms of the Governor's executive orders by gathering in groups of more than 250 people. Henry Testimony at 60-3 – 60-25.

69.     On June 27, 2020, LPPA member Marc Bozzacco, and five other LPPA members were stopped by a park ranger in Fort Washington State Park while collecting signatures for LPPA candidates.  The ranger told them they were not permitted to collect signatures.  There were at least one hundred people in the park and after three hours of trying to collect signatures, the LPPA members collectively only obtained twelve signatures.  *See* Declaration of Marc Bozzacco, attached.

70.     On July 1, 2020, Governor Wolf issued an Order, signed by Secretary of Health, Dr. Rachel Levine, stating:

> Except as provided in Section 3, individuals are required to wear face coverings if they are:
>
> A.  Outdoors and unable to consistently maintain a distance of six feet from individuals who are not members of their household;
> B.  In any indoor location where members of the public are generally permitted;
> C.  Waiting for, riding on, driving, or operating public transportation or paratransit or while in a taxi, private car service or ride-sharing vehicle…

(*see*  https://www.governor.pa.gov/wp-content/uploads/2020/07/20200701-SOH-Universal-Face-Coverings-Order.pdf).

71.     Pennsylvania achieved a "downward … trend" in dealing with the COVID-19 pandemic due to "the stringent requirements to stay home coupled with actual compliance from Pennsylvania citizens." Henry Testimony at 56-15 – 56-20.

72.     In response to the rise and persistence of the COVID-19 pandemic, the Democratic National Committee has advised its delegates to attend its convention remotely. Henry Testimony at 56-19 – 56-23.

### E. Plaintiffs' Efforts and Difficulties Collecting Signatures

73.     Plaintiffs, their officers, agents and volunteers, four of whom testified, have substantial experience collecting signatures.  Moore Testimony at 9 (Libertarian Party member and office-holder testified that she collected approximately 200 signatures in-person both as a candidate in 2017 and for another campaign in 2018); Runkle Testimony at 108, 109 (Green Party member, officeholder and candidate for statewide office, testified that he has collected signatures for himself and other candidates every year since 2016 in Pennsylvania and that in 2016 he personally collected approximately 600 signatures); Gaughen Testimony at 37 ("testifying  that LPPA had "about 50 active volunteers that year, [and] we collected a little over 15,000 [Fifteen Thousand] signatures.").

74.     One of the most productive methods to collect signatures is to do so outside the polls on primary election days and to attend other large gatherings. Gaughen Testimony at 37-38 ("the most effective method [of obtaining signatures] is to stand outside the polls on Primary Day, because everyone coming in or out is a registered voter, typically.  So you are going to get a very high validity rate."); *id*. ("after Primary Day or outside of Primary Day…the best way to [obtain signatures] is at a large gathering in public, so a street fair, or concerts, public parks.  Up until this year, you know, we could count on big crowds in public areas in certain places.  That is kind of not happening this year."); Scheetz Testimony at 79, 85 (testifying that he was able to collect a hundred signatures on Primary Election Day); Runkle Testimony at 109 ("The large events are

17

much more effective as far as the time required to gather the greater number of signatures. Some of the events we tabled at in Lancaster County.  We could collect towards 600, 800 signatures in the matter of six hours.  In comparison, if I did that on the ground just canvassing a street, in six hours I may get 20 to 30 signatures at best.").

75.     The most productive seasons for collecting signatures are Spring and Summer and the most productive months are April, May and June.  Runkle Testimony at 112-13.

76.     Plaintiffs have relied on festivals and other large gatherings in the past to collect the needed signatures to place candidates on ballots. Runkle Testimony at 110 ("we would canvass at Lancaster Pride Fest.  We would canvass at the Latino Festival.  We would also do Lancaster Peace Fest."); Hearing Transcript, Testimony of Steve Scheetz (hereinafter "Scheetz Testimony"), at 97-98 ("Memorial Day picnics…July 4th picnics…Puerto Rican Day…an arts and crafts event up in northern Bucks County.").

77.     As a result of the prohibition on gathering of more than 250 people, numerous municipal or government planned July 4th festivities, parades and fireworks displays have been canceled.  Runkle Testimony at 110, 113, 122; Moore Testimony at 20.

78.     The Governor's emergency orders precluded circulators from gathering signatures in-person either at public events or door-to-door from March 23, 2020 until June 5, 2020 in many Counties across Pennsylvania, thus denying to Plaintiffs several weeks of the most productive time to collect signatures.  *See* Stipulated Facts, R.35, at ¶¶ 44-59; Gaughen Testimony at 62 (testifying that the Governor's Orders prevented the LPPA from petitioning for "two months at least").

79.     The Governor's ban on large gatherings in Pennsylvania beginning on March 23, 2020 has resulted in continuing cancelations of large events that have in the past been used by Plaintiffs to successfully gather signatures and that were planned to be used to collect signatures

in the current election cycle. Runkle Testimony at 110 ("all of those events either have been canceled or postponed until -- either not rescheduled or after September."); *id*. at 122 (testifying that even in the green phase Counties where gatherings of up to 250 people are now allowed, Runkle does "not believe that there are any events being planned in many of those Counties."); *id*. at 113 (testifying that the Green Party "did have a lot of events planned during April, specifically April, which were all canceled due to shutdown and the concerns over COVID."); Moore Testimony at 20 ("There is still a restriction on large gatherings in the yellow phase, and that is the best place for us to collect signatures, our parades and festivals and places like that, so it is still very difficult for us to get the signatures we need."); Scheetz Testimony at 80-81 ("door knocking is extremely ineffective" and testifying that at large gatherings, such as festivals, petitioners "would get six people at a time to sign your petition.  They would pass it around to each other, used the same pen.").

80.    Plaintiffs and their candidates have attempted to collect signatures for their campaigns in order to appear on the Pennsylvania 2020 general election ballot but have not been able to collect the requisite numbers needed.   Moore Testimony at 16 ("the slate of Libertarian Party candidates has only been able to collectively gather "a few hundred" signatures from "within our families because there were not large gatherings for us to go to."); Runkle Testimony at 120 (testifying that he was able to circulate petitions before the COVID-19 shutdown and personally collected "about ten signatures"  "in one large event March 9th"): id. at 119-20 (testifying that he believed the Green Party had collected in the aggregate for all its candidates between 200 and 500 signatures at the time of the Hearing).

81.    Plaintiffs and their candidates have made diligent efforts to collect signatures while complying with Pennsylvania's emergency orders and will continue to do so.  Gaughen Testimony

at 54 (testifying that the LPPA is "out there collecting every single day.  We are going to work double time to collect the signatures.").

82.     Plaintiffs hired paid circulators but have yet to use them because of the COVID-19 crisis and the Governor's emergency orders shutting down the State. Moore Testimony at 12-13 ("We had a board meeting after our State Convention the first weekend in March and at that time the Board voted to release the funds to hire paid petitioners.  I did hire two petitioners.  I gave them contracts.  They never started petitioning because about a week-and-a-half later with COVID-19 starting to ramp up, I did not feel that it was safe for them to go door-to-door or for them to go to large gatherings, which really is the best way to collect signatures."); Runkle Testimony at 120 (Green Party does not use paid circulators).

## F. Alternatives to In-Person Collection Are Either Not Available or Feasible

83.     Plaintiffs have attempted to use social media and other advertising techniques to entice voters to sign nomination papers but with little success.  Gaughen Testimony at 67 (testifying that although LPPA candidates are trying to hold events to obtain signatures, and are advertising such on social media, very few people are interested during the COVID-19 crisis as illustrated by LPPA candidate Liz Terwilliger's experience with her Facebook's posting eliciting only one response).

84.     Signature collection by mail and/or e-mail is not an economical, practical or readily available method of gathering signatures in Pennsylvania nor is it an adequate substitute for collecting signatures in-person at large events or even going door-to-door.  Moore Testimony at 10 (testifying that successfully collecting signatures by U.S. Mail cost $25.00 per signature); *id*. at 17 (testifying that using e-mails to transmit petitions to voters and replace the U.S. Mail alternative

would not proceed more efficiently or more cheaply because voters "would need legal paper to print front to back, and they need to have the ability to do that at home.  In addition, the voter registration list don't always include e-mails."); *id* at 11 ("if we sent out 5,000, at a 5 percent return rate we would need to send 100,000 envelopes, and it would cost $125,000 to get the signatures that we needed, and that is just for the supplies, we would also need the labor to stuff 100,000 envelopes.");  *id*. at 11 (testifying that in-person collection by paid circulator was an "average going rate [of] about $3 a signature"); Runkle Testimony at 114 ("It's not something that we had tried.  We have looked into it, and the Party believes that it is cost prohibitive for us to do something like that."); *id*. at 115 (it would cost "$86,000 just in postage to send and for return plus the odd size paper that these petitions are required to be collected in the number of envelopes. It would be over a hundred thousand dollars for us to launch an all-mail petitioning effort."); *id*. at 118 (testifying that Green Party has considered e-mail delivery but concluded it will not work because of "people filling them out incorrectly and being uninformed how to properly circulate a petition"); Gaughen Testimony at 83 ("People just simply don't look at your e-mails.  So when you e-mail people, it does not matter how supportive they were in the past, they don't necessarily respond to it.  You might get five or six people out of 10,000 e-mails."); *id*. at 69, 88 (testifying that a signor or circulator would still have to print out on legal-sized paper the form, sign it and mail it back to the party).

85.     Unlike the major parties, the Plaintiffs do not have the finances to maintain a sophisticated voter registration database.  Scheetz Testimony at 93 ("we don't have all [of the supporters'] phone numbers.  We don't have all their addresses.  The database that we have of the registered Libertarians is not one of those databases that is kept up-to-date extremely well…so we get a lot of returned mail.").

21

86.     The State's voter registration list does not always include e-mail addresses and phone numbers of the voters and Plaintiffs therefore do not have access to the e-mail addresses or phone numbers of the 8.8 million voters in Pennsylvania.  Scheetz Testimony at 98-99.

87.     Collecting signatures in-person requires close contact and cannot generally be successfully practiced from a six-foot distance.  Runkle Testimony at 109 ("A lot of the signature collection process was done in person, face-to-face, essentially me with a number of clipboards. We would approach people either on the streets or we would have a booth set up during large events.  Those are the two primary methods along with, I guess, the third being standing outside of the polls of primary elections or special elections."); *id*. at 111 ("I approach an individual. I interject myself in a conversation. That conversation probably takes two or three minutes, probably minimum, until a person either decides or we agree that they are not interested in signing the petition. I hand them a clipboard, and normally I stand right next to them so I can instruct them where they need to sign, so they do not make a mistake on that petition.); *id.* ("Runkle testified that he had never stood six feet away from someone while that person signed a petition; instead, he testified that he stands "shoulder to shoulder" with them because "I do not like having my hand off the clip board because in the past you have had people take those and run with them or deface the petition themselves. So as a best practice I normally hold that clipboard, if possible.").

88.     Door-to-door signature collection and in-person signature collection remain difficult notwithstanding Pennsylvania's recent relaxation of its shelter orders. Moore Testimony at 27 ("It would be very difficult to approach somebody and hand them a clipboard and a pen when you have to stay 6 feet away."); *id*. at 27 (even though door-to-door solicitation may not be unlawful, "members of the party have reported that people are very hesitant to sign papers and approach them"); *id*. (compounding the difficulty are the errors in the State's database of voter's

addresses, *id*. at 13, since about 20% of the addresses in that database have proven to be incorrect); Scheetz Testimony at 94 ("supermarket managers don't like us being in their supermarket. Walmart managers don't like us in their parking lot").

89.     Going door-to-door during the COVID-19 pandemic is dangerous to both the circulator and potential signors. Gaughen Testimony at 39 ("in order to circulate [nomination papers] in public, you have to hand this clipboard to somebody, you have to get within 6 feet of them to hand it to them.  They have to touch your pen, your clipboard, and a lot of people are not willing to do that right now.").

90.     Plaintiffs, their members, their candidates, and their agents fear for the safety of themselves and others should they be required to collect signatures in-person during the continuing COVID-19 crisis.  Moore Testimony at 12, 14 (testifying that while she was not necessarily concerned about her own safety she was concerned about spreading the virus to others, including her immediate family members: "My father is in a nursing home, my husband has multiple morbidities.  I would fear for my family's safety if I was out face-to-face with hundreds of people."); Runkle Testimony at 112 ("I think it's a concern to be out in the public if you could transmit this disease.  Personally, I'm more worried about the family members in my immediate circle who have underlying health conditions that would exacerbate the illness, so that is a concern for me.  … My wife suffers from asthma.  … My father-in-law has diabetes, asthma as to himself, he would be a high-risk individual.  … It makes sense for me to not engage in adverse activities at this time."); *id*. ("Me collecting signatures right now is not a choice I would make.  But if I had and did make that choice, I would wear appropriate PPE, including a mask, probably some eye protection, along with bringing some additional means to sanitize myself and my circular material, like pens."); *id*. at 116 (""[a] lot of our volunteers have asked specific questions about precautions

that we could provide them via PPE, face masks, gloves, sanitizer.  There is a lot of concern from them about what they would be provided to do that type of work," and "[t]his is not something that we would consider putting our volunteers in a position to do under a yellow phase."); Gaughen Testimony at 40 ("testifying that his wife "has a medical condition that could make her susceptible to the virus.  Also you don't know when you are out there petitioning, what other people's health concerns are.  You are putting all of them at risk.  Any time that you hand that clipboard to someone, the virus can be on the paper, on the pen.  It could be you, you don't know.").

### G. It Is Unlikely that Plaintiffs Can Satisfy Pennsylvania's Deadline Under Current Conditions

91.    It is unlikely in light of the continuing COVID-19 crisis, the Governor's emergency orders legally prohibiting Plaintiffs from gathering signatures in-person for several weeks during March and April, his emergency orders canceling large gatherings, his emergency orders continuing to prohibit large gatherings, and his emergency orders continuing to require physical distancing, that Plaintiffs' candidates can and will timely qualify for Pennsylvania's 2020 general election ballot.  Gaughen Testimony at 38 (testifying that it is not likely the Libertarian Party can collect 5,000 signatures by the sole method of going door-to-door); Runkle Testimony at 116 ("I think it is highly unlikely that it would be possible" for his campaign to "successfully collect those 2,500 signatures by the deadline"); Moore Testimony at 13-14 ("I don't think that we can do it safely.  First of all, there won't be any large gatherings, which is one of the best ways to collect signatures.  And the other way is to go door-to-door and you would be exposing people to potential infection."); *id*. at 33-34 ("I am very worried about it. I don't know that we will.  We have missed most of our petitioning period already because of the orders.  We have got a month left, and it's very difficult to collect with the social distancing.").

92.     As observed by the Court, for all these reasons signature collection for numerous local and state-wide candidates is a "major enterprise," Gaughen Testimony at 72, and cannot likely be accomplished by Minor Parties by August 3, 2020.  Gaughen Testimony at 72-73 (Court: "This is a major enterprise to get these signatures, is that correct?" Mr. Gaughen: "Yes, Your Honor." Court: "In this pandemic for so many reasons from the actions of the State with the lockdown, but also just the nature of it, putting people in fear of contact and with social distancing, what people are voluntarily doing to prevent illness has made it much more difficult to get these signatures, is that correct?" Mr. Gaughen: "Yes, sir…[signature collection] is a major undertaking for us in a year without a pandemic, but right now it is especially limited." Court: "Is there any doubt in your mind that you will get the necessary signatures regardless of the outcome of this case? Mr. Gaughen: Yes, Sir.  I don't think we can do it this year."); *id.* at 40 ("I don't think that we are going to be able to do it this year.  Even if we did do a huge push, I don't think that is a responsible thing to do.").

93.     There have been no large public events at which Plaintiffs could engage in petitioning since the COVID-19 pandemic arose. Henry Testimony at 82-3 – 82-13; *id.* at 82-10 – 82-13 ("Right. I wasn't actually thinking, like, during – I wasn't thinking of setting up a table aside from these protests that have been happening.").

### H. Defendants Fail to Assert a Legitimate State Interest That Justifies the Burdens Imposed on Plaintiffs' First and Fourteenth Amendment Rights.

94.     Defendant's asserted interest in this case is to ensure that "only viable candidates [are] on the ballot." Marks Testimony at 174-21 – 174-25.

95.     Defendants do not dispute that Pennsylvania's petitioning requirements, as applied prior to the onset of the COVID-19 pandemic, were sufficient to protect the state's interest in

ensuring that candidates and parties demonstrate a modicum of support as a prerequisite to appearing on the general election ballot. Marks Testimony at 174-19 – 175-2.

96.     Defendants admit that "COVID-19 has made it more difficult and has required a greater degree of creativity in circulating and collecting signatures." Marks Testimony at 175-5 - 175-7.

97.     There is no evidence of "voter confusion" in Pennsylvania in the two general elections (2016 and 2018) since this Court granted injunctive relief in *Constitution Party of Pa. v. Aichele*. Henry Testimony at 79-1 – 81-5.


I. **The Testimony Defendants' and Intervenor's Witnesses Is Not Credible With Respect to the Key Issues in This Case.**

98.     Defendant Marks has never collected signatures on nomination papers or nomination petitions. Marks Testimony at 172-4 – 172-6; 172-15 – 172-16. Mr. Marks' conclusion that it is not "practically impossible" to collect signatures during the COVID-19 pandemic is "speculative," because it is not based on his first-hand knowledge, but rather on his experience "having talked to" and "having dealt with candidates firsthand." *Id.* at 172-7 – 172-14.

99.     Defendant Marks is "not a health expert, so I'm not going to speculate whether it is one hundred percent safe" to collect signatures in green or yellow phase counties. Marks Testimony at 175-18 - 175-20. "There are things that can be done to mitigate the possibility of spread, but I'm not in a position to make an – to give an expert opinion about whether it's healthy to do this or that." *Id.* at 175-25 – 176-3.

100.    Mr. Henry testified incorrectly that the Department of State will accept nomination papers printed on regular 8-1/2-inch by 11-inch paper. Henry Testimony at 55-14 – 55-18. In fact,

Mr. Henry subsequently admitted, nomination papers "must be printed two-sided on 8-1/2 by 14 paper head to head," meaning "legal-sized paper." *Id.* at 56-8 – 56-16.

101.    Mr. Henry is not a medical doctor or expert in infectious disease. Henry Testimony at 58-13 – 58-18. Mr. Henry does not know whether coming into contact with 25 people over a period of two hours is as dangerous as gathering in a crowd of 25 people for two hours. *Id.* at 61-20 – 62-1.

102.    Mr. Henry is unwilling to testify that it is "safe" to go door to door to collect signatures during the pandemic. Henry Testimony at 62-2 – 62-9 ("I will say this: I know people that have done it. I know that if you are wearing masks, if you are wearing gloves, if you are knocking on the door then taking steps back, you can have conversations at the doors.").

103.    Mr. Henry would not advise his own petitioners to collect signatures door to door during the pandemic, but would advise them to pursue other methods. Henry Testimony at 62-13 – 62-25 ("If the pandemic – you know, we had all this time, what I would actually advise them to do is what I said. I would advise them to use social media, email petitions, instruct people how to do it, or mail the petitions, or – or use networks that you could have a situation where you could have a local party, you know, whether it be a major or minor party. Set up an event.").

104.    Mr. Henry has not collected signatures during the COVID-19 pandemic. Henry Testimony at 62-10 – 62-12. Mr. Henry has never collected signatures for minor parties in Pennsylvania. *Id.* at 63-18 – 63-25.

105.    Mr. Henry testified that he has obtained "probably a couple thousand" signatures on nomination petitions or papers by emailing them to voters who sign and return them, Henry Testimony at 66-19 – 66-24, but any such signatures that voters submit via email are invalid. Marks Testimony at 171-18 – 172-2. Consequently, such signatures would be valid only if voters printed

out the nomination papers on legal-sized paper, signed them, and returned the hard copy via First Class Mail or an equivalent delivery service, or hand-delivered them. Henry Testimony at 67-6 – 67-18.

106.    Mr. Henry admits that the COVID-19 pandemic presents a barrier to ballot access that no candidate or party has had to face in more than 100 years, but nonetheless compared it to the challenge of petitioning during inclement weather. Henry Testimony at 86-5 – 86-22) ("Q So, basically, what you're saying is the law is the law? A Yeah. We -- again, what I -- what I would say is you know what you're -- when you run for office, there are rules. There are -- there is -- it is what it is, and you have to plan according to the outlines that you're given. You plan, you execute, and every campaign I've ever been a part of has had some type of barrier, whether it be a blizzard or whether it be something that inhibits the ability to collect petition signatures. You have to plan around that, and then, you know, through that planning and through that execution, that's how you get on the ballot. Q And you would agree that there's never been a wide-scale pandemic like we've seen here, at least in recent history? A Right. I think, what, 1919 or 1918.")

## II.    Proposed Legal Conclusions

107.    Defendants' enforcement of the petitioning requirements imposed upon Plaintiffs by 25 Pa. Stat. Ann. § 2911 (as modified by this Court's February 1, 2018 Order in *Constitution Party of Pa. v. Aichele*, No. 12-2726 (Doc. No. 115)), in combination with the petition circulation period specified by 25 Pa. Stat. Ann. § 2913(b) – (c), impact rights guaranteed to Plaintiffs under the First and Fourteenth Amendments.

108.    In particular, Defendants' enforcement of §§ 2911 and 2913(b) – (c) impact Plaintiffs' freedom to associate. *See Constitution Party of Pa. v. Cortes*, 116 F. Supp. 3d 486, 499

(E.D. Pa. 2015), *aff'd*, 824 F.3d 386 (3rd Cir. 2016) ("Freedom to associate for political ends has little practical value if the plaintiffs cannot place their candidates on the ballot and have an equal opportunity to win votes.") (citing *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).

109.    Defendants' enforcement of §§ 2911 and 2913(b) – (c) also impact Plaintiffs' voting rights. *See id.* ("[B]allot access restrictions also burden the fundamental right of voters to cast their votes effectively … because the rights of voters and the rights of candidates do not lend themselves to neat separation. ....") (citing *Ill. State Bd. of Elections*, 440 U.S. at 184; *Bullock v. Carter*, 405 U.S. 134, 143 (1972)) (quotation marks omitted).

110.    The executive orders issued by Governor Wolf, which prohibited Plaintiffs from engaging in petitioning to qualify for Pennsylvania's 2020 general election ballot during a substantial portion of the statutory petitioning period, and which continue to infringe Plaintiffs' right to petition, impact Plaintiffs' core First Amendment rights. *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 186 (1999) ("Petition circulation … is 'core political speech,' because it involves 'interactive communication concerning political change.'") (quoting *Meyer v. Grant*, 486 U.S. 414, 422 (1988)).

111.    "When the right to vote and freedom to associate 'are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance.'" *Constitution Party of Pa.*, 116 F. Supp 3d at 500 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)) (internal quotation marks and citation omitted). Thus, "strict scrutiny" applies in cases where the challenged "regulation is sufficiently severe." *Constitution Party of Pa.*, 116 F. Supp 3d at 500.

112.     Similarly, infringements upon Plaintiffs' right to petition are invalid unless they can withstand "exacting scrutiny." *Buckley*, 525 U.S. at 204 (citation omitted). To survive such scrutiny, a state must show that its asserted interests are "substantial" and "important" and that less burdensome alternatives are insufficient to serve those interests. *See id*. at 204-05.

113.     Defendants' enforcement of §§ 2911 and 2913(b) – (c), in combination with the prohibitions and restrictions imposed by Governor Wolf's executive orders, severely burdens Plaintiffs' First and Fourteenth Amendment rights.

114.     Such enforcement severely burdens Plaintiffs' associational rights because there is a strong likelihood that it will result in their exclusion from Pennsylvania's 2020 general election ballot – not because they lack the requisite 'modicum of support' among the electorate, but because Defendants have deprived Plaintiffs of a lawful means of demonstrating that support by prohibiting or infringing their right to engage in petitioning. *See Constitution Party of Pa. v. Cortes*, 116 F. Supp. 3d at 499 (citing *Ill. State Bd. of Elections*, 440 U.S. at 184).

115.     Such enforcement severely burdens Plaintiffs' voting rights because there is a strong likelihood that it will deny Plaintiffs the opportunity to cast their votes for the candidates they support and with whom they wish to associate. *See Williams v. Rhodes*, 393 U.S. 23, 31 (1968) ("[T] the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.").

116.     Such enforcement severely burdens Plaintiffs' right to petition because it requires Plaintiffs to obtain signatures on nomination papers as the sole means by which they may qualify for Pennsylvania's 2020 general election ballot, while the Governor's executive orders effectively prohibited Plaintiffs from engaging in petitioning for a substantial portion of the statutory petitioning period. *See*, *e.g.*, *Meyer*, 486 U.S. at 424-25 (finding that statute prohibiting payment

of petition circulators imposed impermissible burden on First Amendment rights). Here, the burden on Plaintiffs' right to petition is even more severe than the burden in *Meyer*, because the Governor's executive orders are tantamount to an outright prohibition on petitioning during the relevant statutory period.

117.    Because Defendants' enforcement of §§ 2911 and 2913(b) – (c) in combination with the prohibitions and restrictions imposed by Governor Wolf's executive orders impose severe burdens on Plaintiffs' First and Fourteenth Amendment rights, the provisions cannot withstand constitutional scrutiny unless Defendants can show that no less burdensome alternative is available to protect Pennsylvania's asserted interests. *See Ill. State Bd. of Elections*, 440 U.S. at 185 ("[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty, and we have required that States adopt the least drastic means to achieve their ends.") (citation and quotation marks omitted).

118.    Defendants fail to carry their burden of demonstrating that their enforcement of §§ 2911 and 2913(b) – (c) at the same time that the Governor's executive orders remain in effect is necessary to further the state interests that Defendants assert.

119.    Defendants assert an interest in ensuring that only "viable" candidates appear on Pennsylvania's general election ballot, but that is not a valid state interest. The state has a legitimate interest in ensuring that candidates demonstrate a "modicum of support" as a prerequisite to qualifying for the ballot – not that candidates are "viable". *See Jenness v. Fortson*, 403 U.S 431, 443 (1971).

120.    Defendants also point to the generalized state interests typically asserted to justify ballot access restrictions – *e.g.*, the state's interest in maintaining an orderly ballot and to avoid the "voter confusion" that might result if too many candidates or parties qualify – but Defendants

fail to acknowledge the extraordinary circumstances from which this case arises. Specifically, Defendants acknowledge that the COVID-19 pandemic and the Governor's ensuing executive orders impose new and additional burdens on petitioning candidates and parties that are unprecedented in recent memory, yet Defendants made no effort to address or remediate the sole procedure that Pennsylvania affords Plaintiffs to qualify for the ballot during the pandemic – *viz.*, obtaining voters' signatures in-person and by hand on nomination papers. Indeed, Defendants acknowledge that they did not respond to Plaintiffs' urgent requests for relief in March and April – during the height of the statutory petitioning period – except to acknowledge receipt.

121.    Other states, meanwhile, have taken appropriate action not only to protect the constitutional rights implicated here, but also to protect the public health. In Illinois, for example, the State Board of Elections agreed to allow minor parties access to the ballot for offices for which they had qualified in 2018 or 2016, reduced its signature requirement for all other candidates by 90 percent, extended its filing deadline, and authorized the use of electronic petitioning procedures, among other relief. *See* Consent Order, *Libertarian Party of Il v. Pritzker*, No. 1:20-cv-02112, ECF No. 27 (N.D. Il. April 23, 2020). In Maryland, the State Board of Elections adopted a procedure authorizing electronic petitioning procedures, and agreed to a 50 percent reduction of its signature requirement. *See* Consent Order, *Green Party of Md. v. Hogan*, No. 1:20-cv-1253, ECF No. 25 (D. Md. June 19, 2020).

122.    Despite Defendants' failure to adopt similar remedial measures, they offer no reason why Pennsylvania's ballot access requirements – which were sufficient to protect its general regulatory interests before the onset of the COVID-19 pandemic – remain necessary to protect those interests now, when a pandemic has rendered in-person petitioning unlawful and practically impossible at most, and severely burdensome at the least.

123.   Defendants' contention that it is Plaintiffs' obligation to fashion their own procedure to address the impossibility or impracticability of in-person petitioning is not tenable. Defendants suggest, for example, that Plaintiffs should obtain their required signatures via email. As Defendants' own witness Mr. Marks acknowledges, however, signatures on nomination papers that have been scanned and emailed are not valid under Pennsylvania law. Moreover, nomination papers must be printed and signed on legal-sized (8-1/2" x 14") paper, which most voters cannot be presumed to have readily available (especially during a pandemic). These limitations render the prospect of obtaining voter signatures by email of limited value. Defendants also suggest that Plaintiffs obtain voter signatures by U.S. Mail, but the evidence in the record demonstrates that such a procedure yields extraordinarily low rates of return and is therefore cost-prohibitive.

124.   Accordingly, the Court holds that Defendants' enforcement of §§ 2911 and 2913(b) – (c), in combination with the Governor's executive orders, cannot withstand constitutional scrutiny under the extraordinary facts of this case. The provisions, as applied here, are not narrowly tailored to further Pennsylvania's legitimate regulatory interests in the context of the COVID-19 pandemic. They are therefore unconstitutional as applied.

125.   Plaintiffs request that the Court "order Defendants to provide to Plaintiffs any … relief the Court deems just." Verified Complaint, R.1, at 27 ¶ 6. The Court concludes that Plaintiffs are entitled to such relief.

Dated: July 2, 2020

Respectfully submitted,

s/ Drew Gray Miller, Esq.

Drew Gray Miller, Esq.
PA ID: 207830
Anderson & Labovitz, LLC
428 Forbes Ave., Suite 1901
Pittsburgh, PA 15219
Office: 412-209-3202
Mobile: 412-760-3286
Fax: 412-291-1001
dmiller@PaLawFirm.com
*Counsel of Record*

Oliver Hall
Center for Competitive Democracy
P.O. Box 21090
Washington, DC 20009
202-248-9294
oliverhall@competitivedemocracy.org
*Pro Hac Vice*

Mark R. Brown
303 E. Broad Street
Columbus, OH 43215
614-236-6590
Attorney for Plaintiffs
*Pro Hac Vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2020 the foregoing document was filed using the Court's CM/ECF system, which will effect service upon all counsel of record.

/s/Oliver B. Hall
Oliver B. Hall