## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF PENNSYLVANIA; THE CONSTITUTION PARTY OF PENNSYLVANIA; GREEN PARTY OF PENNSYLVANIA; STEVE SCHEETZ; KEVIN GAUGHEN; ALAN SMITH; TIMOTHY RUNKLE; BOB GOODRICH; and JUSTIN MAGILL, | : : : : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | NO. 20-CV-02299 |
| TOM WOLF, in his official capacity of Governor of the Commonwealth of Pennsylvania; KATHY BOOCKVAR, in her official capacity as Secretary of the Commonwealth of Pennsylvania; and JONATHAN M. MARKS, in his official capacity as Deputy Secretary for Elections and Commissions, | : : : : : : : : : | JUDGE SMITH  ELECTRONICALLY FILED |
| Defendants. | : | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Defendants Governor Tom Wolf, Secretary of the Commonwealth Kathy Boockvar and Deputy Secretary for Elections and Commissions Jonathan M. Marks, by and through their undersigned counsel, state the following as their proposed findings of fact and conclusions of law in the above-captioned matter:

## PROPOSED FINDINGS OF FACT

1.      When Plaintiffs filed their Complaint on May 14, 2020 (ECF No. 1),
the Commonwealth was in the midst of the statewide reopening plan announced on
April 22, 2020.  *See* Appendix, Ex. 3, p. 6/18; *see also* Ex. 5.

2.      Neither the reopening plan nor any other government directive
prohibits political bodies from collecting signatures for nomination papers.  *See*
Appendix, Exs. 1-13; *see also* Tr. of Hr'g on June 23, 2020 at 122.

3.      As of May 14, 2020 when the Complaint was filed, 24 of the 67
counties in Pennsylvania were in the yellow phase of reopening.  *See* Appendix,
Ex. 5.  Thirteen additional counties became yellow on May 15, 2020.  *Id.*, Ex. 6.

4.      As of June 5, 2020, all 67 counties in Pennsylvania were in the yellow
or green phases of reopening.  Specifically, 34 counties were in the green phase
and 33 counties were in the yellow phase.  *See* Appendix, Exs. 5-11.

5.      None of the 67 counties in Pennsylvania were under any stay-at-home
restriction as of June 5, 2020.  *See* Appendix, Exs. 5-9.

6.      As of June 5, 2020, political body candidates had 60 days remaining
before the August 3, 2020 deadline to submit nomination papers.

7.     Political body candidates also had 33 days between February 19, 2020 and March 23, 2020 (the date of the first stay-at-home order) to collect signatures.

8.     There are more than 8.5 million registered voters in the Commonwealth of Pennsylvania who are qualified to sign political body nomination papers.  *See* Tr. of Hr'g on June 23, 2020 at 149; *see also* Defs.' Ex. 5.

9.     Plaintiffs did not call any witnesses or offer any evidence that identifies the total number of signatures that they collected to date.

10.     Plaintiff Libertarian Party of Pennsylvania has been soliciting and collecting signatures to qualify its endorsed slate of candidates for the November 3, 2020 general election ballot.  *See* Tr. of Hr'g on June 23, 2020 at 16, 18, 21, 39, 43-44, 46-47, 51-52, 53-54, 78-79, 81, 86, 119-20, 128.

11.     Jennifer Moore, the Eastern Vice-Chair of the Libertarian Party of Pennsylvania and a candidate for Auditor General, testified that the "Executive Director" of the Libertarian Party of Pennsylvania is aggregating and keeping track of the number of signatures collected for Libertarian Party of Pennsylvania candidates.  *See* Tr. of Hr'g on June 23, 2020 at 16.  Ms. Moore testified:  "I believe the signatures are being sent to our Executive Director, and he picks them up at the post office in Harrisburg.  So he would be gathering those."  *Id.* at 16-17.  The Executive Director of the Libertarian Party of Pennsylvania, Kevin Gaughen,

testified that he did not know how many signatures the Libertarian Party had as of the date of the hearing or how many more signatures are needed.  *Id.* 44-45, 73-74. The Chairman of the Libertarian Party of Pennsylvania, Steve Scheetz, testified: "We don't know and we don't know because volunteers don't turn in their petition forms until later.  We have no idea how many signatures people got.  It would be ludicrous to think that we did."  *Id.* at 86.

12.     Ms. Moore testified that, to her knowledge, the Libertarian Party of Pennsylvania collected "a few hundred" signatures from family members.  *See* Tr. of Hr'g on June 23, 2020 at 16.  She personally "circulated to family and friends." *Id.* at 18.  Mr. Scheetz testified that he personally collected "a hundred" signatures on primary election day (June 2, 2020) and that "many [other] people" did the same.  *Id.* at 79, 86.  He testified that "there are a couple of hundred signatures that I'm aware of."  *Id.* at 79.  He also testified that the Libertarian Party "managed to get some signatures . . . both here in my district and out in western Pennsylvania" while "working the polls" at a special election on March 17, 2020.  *Id.* at 81.[1]  He assumed that "many of the candidates are circulating" nomination papers but he

---

[1]  Mr. Scheetz testified that signatures were collected on the "Tuesday after our convention" by persons "working the polls" at a "special election."  *See* Tr. of Hr'g on June 23, 2020 at 81. Plaintiffs allege in the Complaint that the Libertarian Party held its convention on March 6, 2020.  Compl. ¶ 10 n.2.  The Court may take judicial notice that special elections were held in at least three legislative districts in Pennsylvania on March 17, 2020.  *See* Special Elections, available at
https://www.dos.pa.gov/VotingElections/CandidatesCommittees/RunningforOffice/Pages/SpecialElections.aspx (last visited July 2, 2020).

does not know exactly how many are doing so.  *Id.* at 86.  Liz Terwilliger, the

Libertarian Party candidate for the U.S. House of Representatives, advertised on

Facebook that she collected more than two pages of signatures on primary election

day and that she was appearing at other events to collect signatures.  *Id.* at 47, 51.

The Libertarian Party of Pennsylvania elected not to call any witness to identify the

total number of signatures collected through these or other efforts.  Libertarian

Party of Pennsylvania volunteers also attended Black Lives Matter protests for the

purpose of collecting signatures on nomination papers.  *See* Tr. of Hr'g on June 23,

2020 at 54-55.  The Libertarian Party of Pennsylvania elected not to call any

witness to identify how many signatures were collected at any of the protests.

13.     The Libertarian Party of Pennsylvania made a choice prior to any

stay-at-home order not to utilize paid petitioners due to concerns over the COVID-

19 virus.  *See* Tr. of Hr'g on June 23, 2020 at 12-13, 86.

14.     The Libertarian Party of Pennsylvania decided not to utilize email to

send nomination papers to supporters because "email marketing does not really

work that well for us."  *See* Tr. of Hr'g on June 23, 2020 at 83-84.  Mr. Scheetz

testified:  "We have not done it because it has not worked in the past."  *Id.* at 84.

15.     The Libertarian Party of Pennsylvania has not met since the stay-at-home orders were lifted on June 5 to discuss collecting signatures during the yellow and green phases of reopening.  *See* Tr. of Hr'g on June 23, 2020 at 24-27.

16.     The Libertarian Party of Pennsylvania maintains a "social media group just for collecting petition signatures" which consists of "190 of our most adamant volunteers who . . . collect petitions for us."  *See* Tr. of Hr'g on June 23, 2020 at 43.  With respect to the Libertarian Party of Pennsylvania's plans for collecting signatures in the time remaining before the August 3 deadline, Mr. Gaughen testified:  "We are working on it.  We do have a team of volunteers.  Like I said, I do run a social media site.  We have got 200 volunteers.  We are out there collecting signatures every single day.  We are going to work double time to collect the signatures.  It's unfortunate that we are in this situation, and we have to risk spreading the disease just to get on the ballot."  *Id.* at 53-54.

17.     If they started on June 23 (the day of the preliminary injunction hearing), each of the 200 Libertarian Party volunteers identified by Mr. Gaughen would need to collect 5-6 signatures per week or one signature per day to meet the 5000 statewide office signature requirement in the time prior to the August 3 deadline.  *Id.* 56-57.

18.     The Libertarian Party of Pennsylvania has more than 40,000 members.  *See* Tr. of Hr'g on June 23, 2020 at 43.

19.     The Libertarian Party of Pennsylvania is collecting signatures on behalf of a slate of candidates that appear on its nomination papers.  *See* Tr. of Hr'g on June 23, 2020 at 15-16.  As a result, every signature obtained by any candidate for statewide office counts toward the signature requirement for every other candidate for statewide office on the slate of endorsed candidates.  *Id.* at 16; *see also* Defs' Ex. 3.  The Green Party of Pennsylvania also solicits signatures on behalf of a slate of endorsed candidates for statewide office.  *Id.* at 119.

20.     The Green Party of Pennsylvania decided not to "put[] our volunteers in a position" to collect signatures during the yellow phase of the Commonwealth's reopening plan.  *See* Tr. of Hr'g on June 23, 2020 at 121.

21.     Timothy Runkle, the Treasurer of the Green Party of Pennsylvania and candidate for State Treasurer, testified that he is not collecting signatures by choice:  "Me collecting signatures right now is not a choice I would make."  *See* Tr. of Hr'g on June 23, 2020 at 112.  However, he also testified that his intention is to begin collecting signatures immediately in relation to his own candidacy and that he has spoken with other Green Party members "in formulating an effort to petition as soon as we can do it safely."  *Id.* at 116.

22.     The Green Party of Pennsylvania does not utilize paid circulators.  *See* Tr. of Hr'g on June 23, 2020 at 120-21, 126.

23.     The Green Party of Pennsylvania has not tried to collect signatures by mail because "the party believes that it is cost prohibitive for us to do something like that."  *See* Tr. of Hr'g on June 23, 2020 at 114.

24.     The Green Party of Pennsylvania has been conducting outreach efforts through social media, text messages and email to solicit support for its petitioning effort.  *See* Tr. of Hr'g on June 23, 2020 at 128.

25.     The Green Party has a team of 10-20 persons who are coordinating signature gathering efforts and 10-20 volunteers willing to collect signatures.  *See* Tr. of Hr'g on June 23, 2020 at 125-26.  If they started on June 23, each of the 20 volunteers would need to collect approximately 50 signatures per week or seven signatures per day to meet the 5000 statewide office signature requirement in the time prior to the August 3 deadline.

26.     Mr. Runkle, the only witness for the Green Party of Pennsylvania, personally collected "about ten signatures" in March 2020.  *See* Tr. of Hr'g on June 23, 2020 at 120.  He "do[es] not have an exact number" of signatures collected by the Green Party of Pennsylvania to date.  *See* Tr. of Hr'g on June 23, 2020 at 119; *see also id.* at 129-30.  He "estimate[d]" that there are "between 200-

500 signatures," *id.* at 119-20, but he "cannot verify" his estimate, *id.* at 120.  He believes that the party's "Green Light Team Members" would know how many signatures the Green Party of Pennsylvania collected to date, *id.* at 130, but none of the "Green Light Team Members" were called by Plaintiffs to testify at the preliminary injunction hearing.

27.     There are 10,000 Green Party members in Pennsylvania.  *See* Tr. of Hr'g on June 23, 2020 at 120.

28.     The choice by the Libertarian Party of Pennsylvania and the Green Party of Pennsylvania not to participate in canvassing, not to utilize paid petitioners and not to utilize email or regular mail to circulate nomination papers for signature are voluntary decisions by the political bodies and are not attributable to any action by the Commonwealth.  *See* Tr. of Hr'g on June 23, 2020 at 12-13, 83-84, 86, 114, 118, 120-21, 126.

29.     No one has tried to stop Plaintiffs from collecting signatures.  *See* Tr. of Hr'g on June 23, 2020 at 21, 53, 123.

30.     The Pennsylvania Department of State has not received any complaints that any law enforcement agency or official tried to prevent any person from circulating nomination papers or collecting signatures at any time from February 19, 2020 through the present.  *See* Tr. of Hr'g on June 23, 2020 at 154.

31.     Political bodies were never barred from collecting signatures from friends and family.  *See* Tr. of Hr'g on June 23, 2020 at 63.

32.     As of June 5, 2020, 34 of Pennsylvania's 67 counties were green.  As of June 12, 46 counties were green.  As of June 19, 52 counties were green.  As of June 26, 66 counties are green.  *See* Appendix, Exs. 5-9, 13; *see also* Amendment to the Order of the Governor of the Commonwealth of Pennsylvania for the Continued Reopening of the Commonwealth, https://www.governor.pa.gov/wp-content/uploads/2020/06/20200625-TWW-amendment-to-green-phase-order.pdf (last visited July 2, 2020).

33.     There is no prohibition against going door-to-door to collect signatures in the green and yellow phases of the reopening plan.  *See* Tr. of Hr'g on June 23, 2020 at 22; *see also* Appendix, Exs. 3, 5-12.

34.     Political bodies can contact potential supporters through social media or other means and offer to send them nomination papers by email, regular mail or personal delivery.  *See* Tr. of Hr'g on June 23, 2020 at 68, 69.

35.     Political bodies can set up a table in a public place to collect signatures.  *See* Tr. of Hr'g on June 23, 2020 at 28-29, 69, 122.

36.     There is no prohibition against using paid petitioners to collect signatures.  *See* Tr. of Hr'g on June 23, 2020 at 33.

37.     When asked whether they believed collecting the required number of signatures is possible, Plaintiffs' witnesses' responses were equivocal and admittedly speculative.  Ms. Moore testified that she does not "have the exact numbers" that have already been collected, *see* Tr. of Hr'g on June 23, 2020 at 16, and went on to opine:  "I don't think that we can do it safely," *id.* at 13; "I am very worried about it," *id.* at 33; and "I don't know that we will" collect enough signatures in the "month" that is left, *id.* at 33-34.  Although he also lacked "exact numbers" as to how many signatures had been collected to date, *id.* at 44, Mr. Gaughen expressed skepticism that the Libertarian Party could meet the requirement or that it would be "responsible" to try:  "I don't think that we are going to be able to do it this year.  Even if we did do a huge push, I don't think that is a responsible thing to do."  *Id.* at 40; *see also id.* at 73.  Mr. Scheetz testified that "[i]t would be ludicrous to think that" the Libertarian Party had an accurate signature count, *id.* at 86, but nonetheless he offered an opinion that it is "probably not" possible to meet the requirements because "people just aren't interested" and are "fearful of somebody walking up to them with a petition and a pen."  *Id.* at 82.

38.     When asked whether he believed it was possible for Green Party of Pennsylvania candidates to collect the required number signatures, even though he did not know how many signatures had been collected, *see* Tr. of Hr'g on June 23,

2020 at 119-20, Mr. Runkle testified:  "I think it is highly unlikely that that would be possible," *id.* at 116.

39.     It is feasible to collect signatures in an outdoor setting while practicing social distancing.  *See* Tr. of Dep. of Jason Henry at 38; *id.* at 36-39; *see also* Tr. of Hr'g on June 23, 2020 at 28-29.  Circulators can wear masks and gloves, sanitize pens and clipboards, offer hand sanitizer and maintain a comfortable distance from persons signing nomination papers.  *Id.*

40.     The Constitution Party of Pennsylvania offered no testimony or other evidence at the preliminary injunction hearing concerning its signature collection efforts or how many signatures it has already collected.

41.     The Complaint seeks no prospective injunctive relief from Governor Tom Wolf.

42.     There are more than 500 registered political bodies in Pennsylvania. *See* Tr. of Hr'g on June 23, 2020 at 164; *see also* Tr. of Dep. of Jason Henry at 47-48; *see also* Ex. 1 to Dep. of Jason Henry.  Registered political bodies include the F*** Trup Party, the Guns and Dope Party, the Barack Obama Party, the Bernie Sanders Party and the Hillery Clinton Party.  *See* Tr. of Dep. of Jason Henry at 50; *see also* Ex. 1 to Dep. of Jason Henry.

43.     There would be additional costs and significant administrative challenges, including maintaining the integrity of multi-page ballots and ensuring adequate capacity in handicap-accessible devices, if all registered political bodies are permitted to place their candidates' names on the general election ballot automatically and without any showing of support. *See* Tr. of Hr'g on June 23, 2020 at 160-63.

44.     Ballot crowding frustrates efforts to inform the electorate on differences among the candidates, places undue emphasis on ballot position and may prevent successful candidates from winning a majority. *See* Tr. of Dep. of Jason Henry at 13-15, 45-46, 50-51.

## PROPOSED CONCLUSIONS OF LAW

1.     The February 1, 2018 Order in *The Constitution Party of Pennsylvania, et al. v. Aichele*, No. 12-2726, Doc. No. 115 (E.D. Pa. Feb, 1, 2018), sets forth the procedure for political bodies to qualify to appear on the general election ballot in 2020. *See* Defs.' Ex. 1.

2.     To be placed on the general election ballot, political body candidates are required to file nomination papers with a certain number of signatures on or before August 3, 2020. *See The Constitution Party of Pennsylvania, et al. v. Aichele*, No. 12-2726, Doc. No. 115 (E.D. Pa. Feb, 1, 2018) (Defs.' Ex. 1).

13

3.     The number of signatures required for political body candidates to be placed on the November 3, 2020 general election ballot varies by office and ranges between 300 and 5753.  *See* Joint Stipulated Findings of Fact and Conclusions of Law ¶¶ 28, 32-34.  (ECF No. 35.); *see also* Defs.' Ex. 5.  Candidates running for statewide office are required to collect either 5000 signatures (for President of the United States) or 2500 signatures (for Treasurer, Auditor General and Attorney General).  *Id.* ¶ 28.

4.     The signatures on nomination papers can come from any registered voter, active or inactive, regardless of party affiliation.  *See* 25 P.S. § 2911(c); *see also* Tr. of Hr'g on June 23, 2020 at 149.  A registered voter can sign more than one nomination paper.  *See* Tr. of Hr'g on June 23, 2020 at 151.

5.     A political body can circulate nomination papers for an entire slate of endorsed candidates for all federal, state and local offices.  *See* Tr. of Hr'g on June 23, 2020 at 141, 145-46; *see also* Defs.' Ex. 4; Joint Stipulated Findings of Fact and Conclusions of Law ¶ 40.  Therefore, a political body is not required to obtain separate signatures for each office in order to place its endorsed candidates on the ballot.  *See* Joint Stipulated Findings of Fact and Conclusions of Law ¶ 40.

6.     The signatures can come from any place in the state with respect to statewide races.  In district races, the signatures must come from the relevant district.  *See* Tr. of Hr'g on June 23, 2020 at 149-50.

7.     The time period for circulating nomination papers is from February 19, 2020 to August 3, 2020.  *See* Tr. of Hr'g on June 23, 2020 at 140.

8.     Political bodies had 33 days between February 19, 2020, when signatures were first able to be collected, and March 23, 2020, when the first stay-at-home order was issued, to collect signatures.

9.     The emergency declaration issued by Governor Wolf on March 6, 2020 did not prohibit or restrict signature gathering.  *See* Appendix, Ex. 1.

10.     None of the executive orders issued by Governor Wolf prohibited or restricted signature gathering.  *See* Appendix, Exs. 2, 4-12.

11.     There was no prohibition on collecting signatures at any time between February 19, 2020 and today.  *See* Tr. of Hr'g on June 23, 2020 at 154.

12.     Even while subject to a stay-at-home order, political body organizers were able to access and download nomination papers and collect signatures from persons they had contact with and to email or send the nomination papers to supporters to print out, complete and return.  *See* Tr. of Hr'g on June 23, 2020 at

142; *id.* at 148.  Signatures obtained during the period of any stay-at-home order will count for purposes of the signature requirement.  *Id.* at 148.

13.     Persons are able to sign nomination papers as both signatory and circulator.  *See* Tr. of Hr'g on June 23, 2020 at 142.  There is no longer a requirement that the circulator statement be notarized.  *Id.* at 143.  As a result, political bodies are able to secure signatures without in-person contact.  In fact, a political body is able to submit thousands of nomination papers with a single signature on each page to satisfy the signature requirement.  *Id.* at 143-44.

14.     It was not impossible or practically impossible to circulate nomination papers and obtain signatures during the period of any stay-at-home order or any time thereafter.  *See* Tr. of Hr'g on June 23, 2020 at 147-48.

15.     Political bodies have 60 days between June 5, 2020, when the last stay-at-home order was lifted, and the August 3, 2020 deadline to collect signatures.

16.     Plaintiffs' failure to identify the total number of signatures collected to date warrants an inference that collecting the required number of signatures by August 3 is not impossible or practically impossible.  *See*, *e.g.*, *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985) (failure of appellants to offer

16

testimony on issue at preliminary injunction hearing "justifies the inference that their testimony would be unfavorable to their cause").

17.    The Libertarian Party of Pennsylvania's Eastern Vice-Chair, Ms., Moore, conceded that there is no existing prohibition against going door-to-door to collect signatures.  *See* Tr. of Hr'g on June 23, 2020 at 22.

18.    Ms. Moore further conceded that there is no existing prohibition against setting up a table in a public place to collect signatures.  *See* Tr. of Hr'g on June 23, 2020 at 28-29.

19.    Between May 8, 2020 and June 5, 2020, all 67 counties in Pennsylvania transitioned from the red phase to the yellow or green phases where there was no requirement to stay at home and no restriction on travel and where gatherings of up to 25 or 250 people, respectively, are permitted.  *See* Appendix, Exs. 3, 5-13.

20.    There is no restriction on signature gathering in the red, yellow or green phases of the Governor's reopening plan.  *See* Appendix, Exs. 3, 5-13.

21.    Prior to the February 1, 2018 Order in *The Constitution Party of Pennsylvania v. Aichele*, successful nomination papers for statewide office were required to include valid signatures equal to two percent of the vote total for the

candidate with the highest number of votes for any statewide office in the previous election.  25 P.S. § 2911(b).

22.     If the February 1, 2018 Order in *The Constitution Party of Pennsylvania, et al. v. Aichele* were not controlling, candidates for statewide office would need to collect nearly 58,000 signatures to appear on the November 3, 2020 general election ballot.  *See* Tr. of Hr'g on June 23, 2020 at 152.

23.     The Third Circuit has held that requiring political bodies to collect over 67,000 signatures over a five-month period is reasonable, non-discriminatory and not unconstitutional.  *See Rogers v. Corbett*, 468 F.3d 188 (3d Cir. 2006).

24.     It follows *a fortiori* that lesser requirements imposed by the February 1, 2018 Order are also reasonable, nondiscriminatory and constitutionally valid.

25.     For statewide offices for the 2020 election cycle, 5000 signatures constitutes approximately .0588% of the Commonwealth's registered voters and 2500 signatures constitutes approximately .0294% of registered voters.  *See* Tr. of Hr'g on June 23, 2020 at 149 (there are "roughly 8.5 million" registered voters in Pennsylvania).

26.     Counting the 33 days between February 19, 2020 and March 23, 2020 and the 60 days between June 5, 2020 and August 3, 2020, political body

candidates would need to collect less than 55 signatures per day to access the ballot. *See* Defs.' Ex. 5.

27.    It is not impossible for Plaintiffs to achieve access to the November 3, 2020 general election ballot by collecting the signatures required by the February 1, 2018 Order.

28.    That the collection of signatures is made more challenging by social distancing, fewer public events and citizens' fears of the COVID virus does not exclude Plaintiffs from the ballot or render the existing procedure for ballot access unconstitutional. *See Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020).

29.    Personal fear of contracting the COVID virus is not state action and is not grounds to annul the signature requirement. *See Thompson*, 959 F.3d at 810 ("[W]e cannot hold private citizens' decisions to stay home for their own safety against the State. Because the State has not excluded Plaintiffs from the ballot, the burden imposed on them by the State's initiative requirements cannot be severe.").

30.    There is no freestanding right to be a candidate in an election or to have one's preferred candidate appear on the ballot. *See Clements v. Fashing*, 457 U.S. 957, 963 (1982) ("Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'") (citing *Bullock v. Carter*, 405 U.S. 134,

143 (1972)); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) ("That a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights.").

31.     When considering the constitutionality of ballot access laws, courts apply the analytical framework established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992).  Under the *Anderson-Burdick* framework, the district court first weighs the character and magnitude of the asserted injury to the First and Fourteenth Amendment rights the plaintiff seeks to vindicate against the precise interests put forward by the state as justification for any burden, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.  *Burdick*, 504 U.S. at 434.  Under this standard, if the burden imposed upon the right is severe, then the regulation must be narrowly drawn to advance a state interest of compelling importance.  *Id.*  When the law only imposes reasonable, nondiscriminatory restrictions upon First and Fourteenth Amendment rights, the state's important regulatory interests are generally sufficient to justify the restriction.  *Id.*

32.     A burden is severe if it works to exclude legitimate candidates from the ballot.  *The Constitution Party of Pa. v. Cortes*, 116 F. Supp. 3d 486, 501 (E.D. Pa. 2015), *aff'd*, 824 F.3d 386 (3d Cir. 2016); *see also Storer v. Brown*, 415 U.S. 724, 728-29 (1974) (characterizing the burden in *Williams v. Rhodes*, 393 U.S. 23

(1968) as severe because it made it "virtually impossible" for new parties to achieve ballot position for their candidates).

33.     The issue is whether a "reasonably diligent" independent candidate could be expected to satisfy the signature requirement.  *Storer v. Brown*, 415 U.S. 724, 742 (1974).

34.     States have "the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot."  *Anderson*, 460 U.S. at 788 n.9; *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) ("States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office.")

35.     Plaintiffs have failed to demonstrate that such a goal is impossible or virtually impossible.

36.     The 88-day period from May 8, 2020 when the stay-at-home orders began to be lifted and the August 3, 2020 deadline precludes any argument that Plaintiff have been excluded from the ballot.  *See Thompson*, 959 F.3d at 810 ("[T]he five-week period from Ohio's rescinding of its stay-at-home order until the deadline to submit an initiative petition undermines Plaintiffs' argument that the State has excluded them from the ballot.").

37.     Here, as in *Thompson*, there is no reason that Plaintiffs cannot use social or traditional media to solicit registered voters to receive nomination papers by email, regular mail or hand delivery or collect signatures in public places consistent with social distancing practices.  *See Thompson*, 959 F.3d at 810 (rejecting argument that pandemic makes signature collection impossible).

38.     Plaintiffs are not excluded from the ballot by state action when they choose not to collect signatures or private citizens choose to stay at home out of fear of contracting COVID-19.  *See Thompson*, 959 F.3d at 810 ("[W]e cannot hold private citizens' decisions to stay home for their own safety against the State. Because the State has not excluded Plaintiffs from the ballot, the burden imposed on them by the State's initiative requirements cannot be severe.").

39.     The signature requirement in the February 1, 2018 Order does not impose a severe burden on any constitutional right.

40.     The circumstances here are very different from cases in other states where injunctive relief was granted because the window for collecting signatures completely, or nearly completely, overlapped with stay-at-home restrictions.  *See*, *e.g.*, *Esshaki v. Whitmer*, --- F. App'x ---, No. 20-1336, 2020 WL 2185553 (6th Cir. May 5, 2020) (granting stay as to compulsory part of preliminary injunction and denying stay as to remainder where first stay-at-home order in Michigan went

into effect on March 23, 2020 and continued through and after April 21, 2020

when signatures were due); *Sawarimedia, LLC v. Whitmer*, No. 20-CV-11246,

2020 WL 3097266 (E.D. Mich. June 11, 2020) (statewide stay-at-home order in

Michigan remained in effect through and beyond May 27, 2020 when 340,000

signatures were due from proponents of initiative); *Libertarian Party of Illinois v.*

*Pritzker*, --- F. Supp. 3d   ---, No. 20-2212, 2020 WL 1951687 (N.D. Ill. Apr. 23,

2020) (window for collecting signatures in Illinois opened on March 24, 2020, four

days after stay-at-home order took effect; signatures were due on June 22, 2020).

41.     The Commonwealth has a compelling interest in the orderly and

efficient administration of elections.  *See Timmons*, 520 U.S. at 358 ("[I]t is . . .

clear that States may, and inevitably must, enact reasonable regulations of parties,

elections, and ballots to reduce election- and campaign-related disorder.") (citing

*Burdick*, 504 U.S. at 433); *Burdick*, 504 U.S. at 433 ("[A]s a practical matter, there

must be a substantial regulation of elections if they are to be fair and honest and if

some sort of order, rather than chaos, is to accompany the democratic processes.")

(citing *Storer*, 415 U.S. at 730).

42.     The Commonwealth has a well-recognized interest in protecting the

integrity, fairness and efficiency of its ballots and election processes.  *John Doe*

*No. 1 v. Reed*, 561 U.S. 186, 197 (2010) ("The State's interest in preserving the

integrity of the electoral process is undoubtedly important."); *Norman v. Reed*, 502

U.S. 279, 290 (1992) (recognizing state interest in preventing "misrepresentation and electoral confusion"); *Bullock*, 405 U.S. at 145 ("[A] state has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies.").

43.     The Commonwealth has "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Jenness v. Fortson*, 403 U.S. 431, 441-42 (1971) (recognizing state interest "in avoiding confusion, deception, and even frustration of the democratic process at the general election").

44.     The Commonwealth has "a legitimate interest in regulating the number of candidates on the ballot" to prevent the clogging of election machinery, avoid voter confusion and assure that the winner is the choice of the majority. *Bullock*, 405 U.S. at 145.

45.     The Commonwealth also had a substantial government interest in controlling the spread of COVID-19 virus to contain the pandemic, minimize deaths, allocate scarce medical resources and prevent a public health catastrophe. *See Murray v. Cuomo*, No. 20-03571, 2020 WL 2521449, at *11 (S.D.N.Y. May 18, 2020); *see also Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 902-03 (Pa. 2020). ("There is no question that the containment and suppression of COVID-19

and the sickness and death it causes is a substantial governmental interest."),
*petition for cert. filed*, (U.S. May 5, 2020) (No. 19-1265).

46.    These compelling state interests far outweigh the less than severe
burden imposed on political bodies to gather between 300 and 5723 signatures in
the more than five months allotted for signature gathering.

47.    States are not required to compromise policy choices underlying
ballot-access requirements to accommodate particular political parties' strategies
or preferences.  *See generally Timmons*, 520 U.S. at 367 ("States need not remove
all of the many hurdles third parties face in the American political arena today.").
Accordingly, Plaintiffs' asserted preference for soliciting signatures at fairs,
festivals and parades is not relevant and does not support, let alone require,
preliminary injunctive relief.

48.    A preliminary injunction is an "extraordinary remedy" which should
be granted only in "limited circumstances."  *Am. Tel. & Tel Co. v. Winback &
Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994) (citations omitted).
In determining whether to grant a motion for injunctive relief, district courts
consider four factors:  (1) whether the movant can establish a reasonable
probability of eventual success in the litigation; (2) whether the movant will be
irreparably harmed if relief is not granted; (3) the possibility of harm to other

interested persons from the grant or denial of the injunction; and (4) the public interest. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citation omitted).

49.     Because Plaintiffs are seeking a mandatory injunction, they bear a "particularly heavy" burden of demonstrating a right to relief that is "indisputably clear." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

50.     Plaintiffs have not established a right to relief that is indisputably clear and therefore their motion for preliminary injunction must be denied. *See generally Stein v. Cortes*, 223 F. Supp. 3d 423, 442 (E.D. Pa. 2016) (denying request for mandatory preliminary injunction where plaintiffs failed to make "the required 'clear showing of immediate irreparable injury'") (citing *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (E.D. Pa. 2016)).

51.     Other federal courts have denied requests for injunctive relief or stayed preliminary injunctions enjoining enforcement of ballot access procedures due to failure to establish a likelihood of success on the merits where movants alleged that collecting signatures is more difficult due to the COVID-19 pandemic. *See*, *e.g.*, *Thompson*, 959 F.3d at 810-11 (staying district court's preliminary injunction of Ohio's signature requirements pending appeal in part because

plaintiffs had five weeks after rescission of stay-at-home order to collect signatures and signatures were still able to be collected notwithstanding social distancing); *Whitfield v. Thurston*, No. 20-00466, 2020 WL 3451692, at *21 (D. Ark. June 24, 2020) (denying motion for preliminary injunction and finding no severe burden because "[t]he signature collection process was able to continue, albeit in a different manner," including virtual meetings and sending signatures by mail), *appeal docketed*, No. 20-2309 (8th Cir. June 29, 2020); *Sinner v. Jaeger*, No. 20-00076, 2020 WL 3244143, at *6 (D.N.D. June 15, 2020) (denying motion for preliminary injunction where plaintiffs had more than eight weeks after pandemic-related restrictions were lifted to collect more than 26,000 signatures for initiative to amend constitution and refusing "to declare . . . that in-person signature gathering is unsafe during the pandemic" because such a declaration "would venture beyond the bounds of this Court's authority"); *Acosta v. Wolf*, No. 20-2528, 2020 WL 3077098 (E.D. Pa. June 10, 2020) (dismissing *pro se* plaintiff's challenge to 1,000 signature requirement and August 3, 2020 deadline for independent candidate for U.S. House of Representatives and rejecting claim that ballot access scheme violated Equal Protection Clause) (on preliminary screening under 28 U.S.C. § 1915(e)(2)); *Gottlieb v. Lamont*, -- F. Supp. 3d ---, 2020 WL 3046205, at **5-7 (D. Conn. June 8, 2020) (denying motion to preliminarily enjoin reduced requirement that plaintiffs obtain signatures from 3.5% of enrolled party

members in their district during 16-day petitioning window to meet June 11 filing deadline); *Garcia v. Griswold*, No. 20-1268, 2020 WL 2505888, at *2 (D. Colo. May 7, 2020) (finding plaintiffs unlikely to succeed on their ballot access claim in part because "the only timeframe in which the currently ongoing COVID-19 pandemic significantly limited their ability to obtain signatures was roughly the last week before the March 17, 2020 submission deadline" which was before stay-at-home order); *Arizonans for Fair Elections v. Hobbs*, --- F. Supp. 3d ---, 2020 WL 1905747, at *11-14 (D. Ariz. Apr. 17, 2020) (finding plaintiffs unlikely to succeed on merits of their claim and concluding that "reasonably diligent" parties could have complied with state laws during pandemic to secure placement on ballot), *appeal docketed*, No. 20-15719 (9th Cir. Apr. 20, 2020).

52.     Plaintiffs also failed to establish a likelihood of success because they lack standing.  They presented no direct or reliable evidence concerning the number of signatures collected to date and therefore failed to establish that the signature requirement is impossible for them to satisfy.  Their assertion of harm is admittedly and entirely speculative and hypothetical and therefore insufficient to establish standing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("hypothetical future harm that is not certainly impending" does not confer standing); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (to establish injury in fact, a plaintiff must show "an invasion of a legally protected interest"

that is "concrete and particularized" and "actual or imminent, not conjectural or

hypothetical"); *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011)

("allegations of hypothetical, future injury are insufficient to establish standing");

*Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 152-53 (3d Cir. 1999) ("at the

preliminary injunction stage, allegations are not enough to support standing").

53.     Plaintiffs also failed to establish a likelihood of success because there

is no basis for relief under 42 U.S.C. § 1983.  The signature requirement and

deadline that Plaintiffs are seeking to avoid are imposed by federal court order, not

state law, and therefore do not implicate Section 1983.  *See District of Columbia v.

Carter*, 409 U.S. 418, 424-25 (1973) ("actions of the Federal Government and its

officers are . . . facially exempt from [1983's] proscriptions").  Further, any effort

to revise or annul that order must be presented in the context of that proceeding.

*See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) ("until [the court of first

instance's] decision is reversed for error by orderly review, either by itself or by a

higher court, its orders based on its decision are to be respected") (citations

omitted).

54.     Plaintiffs have not demonstrated that they are likely to suffer

irreparable harm absent an injunction.  The Libertarian Party of Pennsylvania and

the Green Party of Pennsylvania have admittedly been collecting signatures in

furtherance of placing their candidates on the general election ballot but they

declined to offer evidence concerning the total number of signatures collected to date or how many signatures they still need to place their candidates on the ballot. Plaintiffs' unsubstantiated and unspecific assertions of harm are insufficient as a matter of law to warrant the extraordinary remedy of injunctive relief. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802-03 (3d Cir. 1989) (reversing grant of preliminary injunction and finding that district court abused its discretion in finding irreparable harm where plaintiff offered "no clear factual record apart from general statements" to substantiate its claim that it would be forced into bankruptcy absent injunctive relief); *ECRI*, 809 F.2d at 227-28 (reversing grant of preliminary injunction because plaintiff's testimony "express[ing] doubts" about ability to secure financing and "concerns" about reputational damage without factoring in relevant contract provisions was insufficient to establish irreparable harm).

55.     The assertion of First Amendment rights does not automatically require a finding of irreparable injury. *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989).  A plaintiff must show a "real or immediate" threat to his or her rights "in the near future." *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997); *Republican Party of Pa. v. Cortes*, 218 F. Supp. 3d 396, 416 (E.D. Pa. 2016). Plaintiffs have not made any such showing.

56.     The signature requirement is not an unconstitutional burden standing

alone or in combination with the now lifted stay-at-home orders or any other

government action as demonstrated above.  Without a recognizable legal harm,

there is no irreparable harm justifying a preliminary injunction.  *Republican Party*

*of Pa.*, 218 F. Supp. 3d at 416.

57.     Granting an injunction would not be in the public interest.

58.     Because the signature requirement does not implicate, much less

violate, the First or Fourteenth Amendments, any injunction of that requirement

would impair and undermine the legitimate state interests referenced above and

irreparably harm the Commonwealth.

59.     Administration of the electoral process is a matter that the

Constitution entrusts to the states.  U.S. Const. Art. I, § 4; *see also Clingman v.*

*Beaver*, 544 U.S. 581, 586 (2005).

60.     Federal courts have no authority to dictate to the states precisely how

they should conduct their elections.  *Thompson*, 959 F.3d at 813.  Further, federal

courts should not alter state election procedures as the election approaches.

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, ___ U.S. __, 140 S. Ct.

1205, 1207 (2020) (per curiam) ("This Court has repeatedly emphasized that lower

federal courts should ordinarily not alter the election rules on the eve of an

31

election."); *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that rise will increase."); *Thompson*, 959 F.3d at 813 ("[W]e must heed the Supreme Court's warning that federal courts are not supposed to change state election rules as elections approach.").

61.    Plaintiffs have not met any of the requirements for the mandatory preliminary injunctive relief that they are seeking and, as a result, their motion should be denied.

Respectfully submitted,

/s/ Donna A. Walsh
Daniel T. Brier
Donna A. Walsh
Richard L. Armezzani

Attorneys for Defendants,
Governor Tom Wolf, Secretary of the
Commonwealth of Pennsylvania
Kathy Boockvar and Deputy
Secretary for Elections and
Commissions Johnathan M. Marks

Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
(570) 342-6100

Date:  July 2, 2020

<u>**CERTIFICATE OF SERVICE**</u>

I, Donna A. Walsh, hereby certify that a true and correct copy of the

foregoing Proposed Findings of Fact and Conclusions of Law was served upon the

following counsel of record via the Court's ECF system, on this 2nd day of July

2020:

> Drew Gray Miller, Esquire
> Anderson & Labovitz, LLC
> 428 Forbes Avenue, Suite 1901
> Pittsburgh, PA  15219
>
> Mark R. Brown, Esquire
> 303 E. Broad Street
> Columbus, OH  43215
>
> Oliver B. Hall, Esquire
> Center for Competitive Democracy
> P.O. Box 21090
> Washington, DC  20009
>
> Clifford B. Levin, Esquire
> Alex M. Lacey, Esquire
> Dentons Cohen & Grigsby P.C.
> 625 Liberty Avenue
> Pittsburgh, PA 15222-3152

/s/ Donna A. Walsh
Donna A. Walsh