# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Joseph Kishore, *et al.*,

      Plaintiffs,

v.                        Case No. 20-11605

Gretchen Whitmer, *et al.,*      Sean F. Cox
                              United States District Court Judge

      Defendants.
_____/

**OPINION & ORDER
DENYING MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Joseph Kishore and Norissa Santa Cruz filed this action challenging Michigan's

ballot-access requirements for independent candidates for the office of President of the United

States, which require an individual to gather and submit physical signatures, on the grounds that

those requirements are impossible for Plaintiffs to fulfil during the ongoing COVID-19

pandemic and in light of Governor Gretchen Whitmer's executive orders issued during the

pandemic. Plaintiffs assert that the State's enforcement of both Michigan's ballot-access

requirements and those orders operate to impose a severe burden on their ability to seek elective

office and vote for the candidates of their choice, in violation of their constitutional rights. They

challenge Michigan's application of its ballot-access requirements *as applied to them* and seek a

preliminary injunction from this Court, ordering Defendants to place their names on the

November 2020 ballot. A hearing on the Motion for Preliminary Injunction was held on July 2,

2020.

As explained more fully below, the Court shall deny the motion. Under the applicable

1

*Anderson-Burdick* framework, Plaintiffs have not shown that the challenged statutes and orders impose a "severe burden" on them. A severe burden excludes or virtually excludes electors from the ballot. Plaintiffs have not shown that Michigan's ballot-access requirements, combined with the Governor's executive orders, exclude or virtually exclude them from the ballot. A reasonably diligent candidate could be expected to satisfy the State's ballot-access requirements under the circumstances presented – where Plaintiffs had a six-month period to meet an already-reduced requirement of obtaining 12,000 signatures and where the Governor's Stay-at-Home Order only restricted them from gathering signatures in-person during the middle third of that time period. But Plaintiffs were not diligent here, where they announced their intention to run back in January, but then never prepared a qualifying petition or obtained a single signature in support of Kishore's candidacy. Under these circumstances, the Court concludes that the burden on these Plaintiffs is somewhere between the minimal and severe burdens discussed in *Anderson* and *Burdick* and, therefore, intermediate scrutiny should be applied.

The Court further concludes that the State's well-established and legitimate interests in administering its ballot-access requirements outweigh the intermediate burden those regulations place on Plaintiffs. As such, Plaintiffs have not shown a substantial likelihood of success on the merits of their constitutional claims. The Court concludes that the remaining factors also weigh against the requested injunction.

## BACKGROUND

Under Michigan election law, in order to appear on the general election ballot, independent candidates for the office of President of the United States are required to file a qualifying petition with the Michigan Secretary of State's office by 4:00 p.m. on the 110th day

before the general election.  Mich. Comp. Laws § 168.590c(2).  It is undisputed that this year's deadline is July 16, 2020 (110 days before the November 3, 2020 election).

Pursuant to Mich. Comp. Laws § 168.544f, a qualifying petition must include a minimum of 30,000 and up to 60,000 signatures of qualified and registered electors in the State of Michigan.  It is undisputed, however, that a permanent injunction issued in *Graveline v. Johnson*, 430 F. Supp.3d 297 (E.D. Mich. Dec. 22, 2019) reduces that signature requirement down to 12,000 – less than half of the minimum statutory requirement – at the present time.[1]

Mich. Comp. Laws § 168.590b(4) requires that a qualifying petition for the office of president of the United States must be signed by 100 registered electors in each of at least half of Michigan's 14 congressional districts.  The signatures on a qualifying petition must be gathered within the 180-day period prior to the date of filing the petition, pursuant to Mich. Comp. Laws § 168.590b(3).

Kishore is a resident of Berkley, Michigan and is a registered voter in Michigan. (Kishore Affidavit).  Kishore wishes to run for the office of President of the United States and would have Santa Cruz serve as his running mate.  Plaintiffs wish to represent the views of the Socialist Equality Party ("SEP").

On January 21, 2020, Plaintiffs filed their Statements of Candidacy with the Federal Election Commission.  (Compl. at ¶ 23; *see also* Kishore Affidavit).

Given the July 16 deadline for filing a qualifying petition (Mich. Comp. Laws § 168.590c(2)), and the requirement that signatures cannot be older than 180 days before the

---

[1]The defendants in that case appealed the district court's decision and that appeal is currently pending in the United States Court of Appeals for the Sixth Circuit.

3

petition is filed (Mich. Comp. Laws §168.590b(3)), Kishore had a window of time from January 18, 2020 to July 16, 2020 to prepare a qualifying petition and obtain the required signatures. Notably, however, Plaintiffs have not prepared a qualifying petition or obtained a single signature in support of Kishore's candidacy. (7/2/20 Hrg. Tr.).

"Prior to and after announcing their candidacies, Plaintiffs and their election staff planned a national ballot access drive." (Compl. at ¶ 4). Plaintiffs state that the "World Socialist Web Site (wsws.org), the political organ of the SEP and its sister parties worldwide, is the most widely-read socialist publication on the Internet" and that "[i]t was accessed by 3.2 million unique visitors between January 1 and April 26, 2020." (Compl. at ¶ 7). "Plaintiffs announced their candidacies in an online video on January 26, 2020 (accessible at socialism2020.org), having timely filed their statements of candidacy on January 21, 2020." (Compl. at ¶ 8).

After announcing their campaigns, Plaintiffs' staff of campaign volunteers began "organizing a series of physical meetings in Michigan" to launch the campaign. (Kishore Affidavit).

For example, the "first public campaign event" was held at the University of Michigan in Ann Arbor, Michigan on February 24, 2020. Three days later, on February 27, a second public campaign meeting was held at Wayne State University in Detroit. (*Id*.). Plaintiffs state that those events were promoted widely at both campuses and also at workplaces and public locations in the surrounding areas. (*Id*.). Nevertheless, Plaintiffs did not obtain a single signature on a qualifying petition for Kishore during any of those in-person events.

In early March, Kishore traveled to California for out-of-state campaign meetings. Kishore was in California on March 3rd through March 5th then returned to Michigan. Kishore

4

states that "[s]hortly after returning, *my campaign decided to cancel all subsequent public events and campaign activity, including ballot gathering initiatives*, in order to protect volunteers, staff and the public at large from spreading the coronavirus." (Kishore Affidavit at 2) (emphasis added) (*see also* 7/2/20 Hrg. Tr., wherein Plaintiffs' counsel stated that Plaintiffs intentionally abstained from gathering any signatures once the virus surfaced).

Thus, during the first week of March, Plaintiffs made the decision to cease all campaign activity, and take no action to obtain signatures for a qualifying petition for Kishore. As of that point in time, Plaintiffs had not prepared a qualifying petition or collected a single signature in support of Kishore's candidacy.

On March 10, 2020, Michigan's first two COVID-19 cases were announced and Governor Gretchen Whitmer declared a state of emergency and invoked emergency powers in Executive Order No. 2020-4.[2] While that order noted the serious nature of the virus, which "can easily spread from person to person," and could "result in serious illness or death," it did not restrict the movement or gathering of people in Michigan.

Thereafter, the Governor issued a series of executive orders to mitigate the spread of the virus in Michigan.

A March 13, 2020 order (Executive Order No. 2020-5) prohibited assemblages of 250 or more people in a single shared space, with limited exceptions, and ordered the closure of all K-12 schools in Michigan. That Order stated that its "prohibition [did] not abridge protections guaranteed by the state or federal constitution under these emergency circumstances." That language will be referred to as the "Constitutional Exemption Language."

---

[2]All executive orders cited herein are available at https://www.michigan.gov.whitmer.

5

A March 16, 2020 order (Executive Order No. 2020-9) ordered various places of public accommodation, such as restaurants, bars and gyms, to close their premises to the public.

A March 17, 2020 order (Executive Order No. 2020-11) prohibited the assembly of more than 50 people in a shared space. This order included the Constitutional Exemption Language.

Then, on March 23, 2020, the Governor issued what became known as the "Stay-at-Home Order" (Executive Order No. 2020-21). That order essentially ordered all persons in Michigan who were not performing essential or critical infrastructure job functions to stay in their place of residence, other than to obtain groceries, care for loved ones, engage in outdoor activity consistent with social distancing, and other limited exceptions. It also prohibited, with limited exceptions, all public and private gatherings of any number of people that are not part of a single household. Although the order was to continue through April 13, 2020, subsequent orders (Executive Order Nos. 2020-42 and 2020-59) extended the Stay-at-Home Order until May 15, 2020. Notably, these orders did not include the Constitutional Exemption Language.

On May 1, 2020, the Governor issued Executive Order No. 2020-70, which rescinded Executive Order No. 2020-59, but kept the general "stay-at-home" restrictions with some additional exceptions.

On May 7, 2020, the Governor issued Executive Order No. 2020-77, which rescinded Executive Order No. 2020-70, and made additional exceptions to those included in Executive Order No. 2020-70.

Subsequent orders (Executive Order Nos. 2020-96, 2020-110 and 2020-115) began implementing a regional approach to the reopening of activities in Michigan.

The currently operative executive orders (Executive Order No. 2020-110 issued on June

6

1st and No. 2020-115 issued on June 5th) permit the reopening of restaurants, bars, retail stores, and many other businesses with restrictions that require face coverings for persons while in enclosed public spaces and additional social distancing precautions.  In addition, groups of persons not part of a single household are permitted to gather outdoors to the extent that persons maintain six feet of distance from one another and gather in groups of less than 100 people in the majority of the lower peninsula and 250 people for the upper peninsula and northern-lower peninsula.

On June 18, 2020,[3] Plaintiffs Kishore and Santa Cruz filed this civil action against the following defendants: 1) Gretchen Whitmer, the Governor of Michigan; 2) Jocelyn Benson, the Secretary of State of Michigan; and 3) Jonathan Brater, the Director of the Michigan Bureau of Elections.  Plaintiffs' "Complaint For Declaratory And Injunctive Relief" includes the following two claims: 1) "Civil Rights Action (42 U.S.C. § 1983): Violations of the First and Fourteenth Amendment Rights of Plaintiffs as Candidates"; and 2) "Civil Rights Action (42 U.S.C. § 1983): Violations of the First and Fourteenth Amendment Rights of Plaintiff Kishore as Registered Voter."

Along with their Complaint, Plaintiffs filed a motion seeking a preliminary injunction. Plaintiffs allege that COVID-19 and the State's Stay-at-Home Order have made is impossible for them to meet Michigan's statutory requirements for Kishore to secure a place on the November ballot as a candidate for the office of President of the United States, thereby violating Plaintiffs'

_____

[3]Although Plaintiffs made the decision to cease all campaign activity and not seek any signatures in Michigan during the first week of March, Plaintiffs waited more than *three months* to file this action challenging Michigan's ballot-access regulations and seeking injunctive relief from this Court.

constitutional rights.  Plaintiffs challenge Michigan's application of its ballot-access statutes as applied to them.

Plaintiffs ask this Court to issue a "preliminary injunction against Defendants restraining them from enforcing" Michigan's "ballot access restrictions as against Plaintiffs" and to order the State Defendants "to place the names of Plaintiffs Kishore and Santa Cruz on the ballot for the November elections."  (Pls.' Motion at 2).[4]

Plaintiffs did not request an evidentiary hearing.  Rather, they ask the Court to grant their requested relief based on their complaint and motion, and its attached declarations and exhibits.  (*See* Pls.' Motion at 2).

In support of their motion, Plaintiffs state that they are challenging Michigan's ballot-access requirements for independent candidates for the office of President of the United States as unconstitutional as applied to them because those "requirements are literally impossible for the Plaintiffs to fulfil during the ongoing global coronavirus pandemic."  (Pls.' Br. at 1).  Plaintiffs claim that the State's "enforcement of the signature-gathering requirements and deadline for ballot access effectively prevents Plaintiffs, through no fault of their own, from getting their names on the ballot."  (*Id.* at 8).  Plaintiffs note that the *Graveline* decision reducing the signature requirement from 30,000 down to 12,000 "remains in effect and applies to them," but

---

[4]In the alternative, Plaintiffs ask the Court to do what the Sixth Circuit has held that a district court may *not* do (*Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020); *Esshaki v. Whitmer*, __ F. App'x __, 2020 WL 218553 at *2 (6th Cir. May 5, 2020)) – issue an injunction that re-writes a state's election law and "order Defendants to reduce the signature requirement to a nominal number, waive the geographic distribution requirement, extend the deadline, and permit the electron gathering of signatures."  (Pls.' Br. at 2). Even if this Court were able to grant such relief, given Plaintiffs' decision not to gather any signatures after the restrictions in the Stay-at-Home Order were lifted, extending the deadline would accomplish nothing.

assert that "enforcing *any physical signature-gathering requirement* together with the current deadline and the geographic distribution requirements as against Plaintiffs under conditions of the ongoing pandemic would be unconstitutional." (*Id*. at 9-10) (emphasis added).

Plaintiffs assert that "Michigan's signature gathering requirements and deadline under conditions of the global coronavirus pandemic constitute an extremely severe burden" on them and the "result is an absolute bar to Kishore and Santa Cruz obtaining ballot access for the November general election." (Pls.' Br. at 13). Plaintiffs assert that under the *Anderson-Burdick* framework, the State's statutes should be subject to strict scrutiny. They assert that the State's "ballot access regime is unlikely to survive strict scrutiny in the context of the pandemic" and therefore believe they are likely to prevail on the merits of their claims. Plaintiffs rely on *Esshaki* and *SawariMedia*.[5]

In response, the State Defendants ask the Court to deny the motion because, among other things, Plaintiffs have not shown a strong likelihood of success on the merits of their First and Fourteenth Amendment claims. They agree with Plaintiffs that the Court is to analyze Plaintiffs' constitutional claims under the *Anderson-Burdick* framework. But they contend that strict scrutiny should not apply.

Defendants' response notes that "[f]rom the record, it does not appear that Plaintiffs have collected even one signature in support of Plaintiff Kishore's candidacy or made any serious effort to do so." (Defs.' Br. at 20). They assert that "Plaintiffs have not been diligent in the exercise of their rights. *See Storer v. Brown*, 415 U.S. 724, 742 (1974) (in assessing ballot access claims by independent candidates, the question is 'could a reasonably diligent

---

[5]*SawariMedia LLC v. Whitmer*, 2020 WL 3097266 (E.D. Mich. June 11, 2020).

independent candidate be expected to satisfy the signature requirements").” (*Id.*)

Defendants state that, from record before this Court, "it does not appear that Plaintiffs made any effort, at all, to collect petition signatures in Michigan during the months of January, February, or March 2020. And while they suggest this was because of the Covid-19 pandemic, Plaintiffs allege in their complaint that they were not even planning on engaging in a ballot access campaign until 'late spring and summer, when potential voters were likely to be paying closer attention to the general election.'” (Defs.' Br. at 1). They state that "noticeably absent from Plaintiffs' pleadings is any description of the efforts Plaintiffs made in 'late spring' to collect signatures or what efforts they are currently making to collect signatures now." (Defs.' Br. at 15). They further assert:

> From March 10, 2020, the date the Governor first declared an emergency, to the present, Plaintiffs could have been circulating petitions and collecting signatures. And plainly since June 1, the opportunity to circulate petitions in person has increased significantly. Moreover, Plaintiffs could have been collecting signatures for the entire time by U.S. mail. Voter address lists may be obtained from local clerks or the Michigan Bureau of Elections. As other candidates have done this election cycle, Plaintiffs could have been mailing petition sheets to registered voters, who then sign the sheet as a voter, and then as a circulator. The completed sheets can then be mailed back to Plaintiffs, dropped off, or picked up by Plaintiffs or their volunteers. It does not appear that Plaintiffs have made any effort to collect signatures in this manner

(Defs.' Br. at 16).

Defendants note that, from the record, "it appears that Plaintiffs made no effort to collect signatures between January 26, 2020 and the date they filed their complaint despite having clear opportunities to do so and knowledge of the July 16 filing deadline." (*Id.* at 17). They contend that "complete lack of effort," along with additional factors, makes this case easily distinguishable from *Esshaki* and *SawariMedia.*

10

Defendants contend that, under the facts and circumstances of this case, "Plaintiffs have not shown that the ballot access requirements combined with the Governor's orders will exclude them from the ballot." (*Id.* at 22). Thus, the State Defendants argue that the burden is not severe and strict scrutiny does not apply. They assert that the challenged requirements should be subject to intermediate scrutiny, as in *Thompson.*

This Court held an expedited hearing on Plaintiffs' Motion for Preliminary Injunction on July 2, 2020.

Prior to the hearing, in response to an order from this Court, Kishore filed an affidavit indicating that as of June 29, 2020, he has "collected zero signatures in the State of Michigan." (ECF No. 13). In that Affidavit, Kishore states that his "campaign made the decision that due to the coronavirus pandemic, any signature gathering would put the lives of our supporters and the public at risk." (*Id.*).

During the July 2, 2020 hearing, Counsel for Plaintiffs advised the Court that Plaintiffs have not yet prepared a qualifying petition in relation to Kishore's desire to have his name placed on the November 2020 ballot in Michigan.

## ANALYSIS

"A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (citation omitted).

"In gauging requests for a preliminary injunction, district courts look at four factors: (1) the plaintiff's likelihood of success on the merits; (2) the risk of irreparable harm to plaintiffs absent injunctive relief; (3) the risk of harm to others resulting from an injunction; and (4) the

broader public interest." *A1 Diabetes & Med. Supply v. Azar*, 937 F.3d 613, 618 (6th Cir. 2019).

These "factors are to be balanced, not prerequisites to be met." *S. Glazer's Distibs. of Ohio,*

*LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).

The movant bears the burden of demonstrating entitlement to the preliminary injunction

sought, and this burden is a heavy one. A preliminary injunction should be granted only if the

movant carries his or her burden of proving that the circumstances clearly demand it. *Leary v.*

*Daeschner,* 228 F.3d 729, 739 (6th Cir. 2000). That is especially so here, as "federal courts

don't lightly tamper with" state election regulations. *Thompson,* 959 F.3d at 812.

## I.    Plaintiffs' Likelihood Of Success On The Merits Of Their Constitutional Claims

While no one factor is controlling, "[w]hen evaluating these factors for an alleged

constitutional violation, the likelihood of success on the merits often will be the determinative

factor." *Thompson,* 959 F.3d at 807. Thus, the Court starts its analysis by considering whether

Plaintiffs have demonstrated that they have a strong likelihood of success on the merits of their

First and Fourteenth Amendment constitutional claims.

As Defendants' brief acknowledges and explains, Plaintiffs have asserted rights that are

protected  by the First and Fourteenth Amendments:

> While Plaintiffs have no fundamental right to run for an elective office,
> *see, e.g., Bullock v. Carter*, 405 U.S. 134, 142-43 (1972) (no "fundamental right
> to run for elective office"), and "[a] voter has no right to vote for a specific
> candidate," *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir.
> 1998) (citations omitted), candidate qualification statutes nevertheless implicate
> "'the right of individuals to associate for the advancement of political beliefs, and
> the right of qualified voters, regardless of their political persuasion, to cast their
> votes effectively.'" *Anderson v. Celebrezze,* 460 U.S. 780, 786-87 (1983)
> (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)). These rights are
> protected by the First and Fourteenth Amendments. *Id.*

(Defs.' Br. at 12).

12

When considering the constitutionality of candidate eligibility or ballot access requirements, courts apply the framework established in *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), as later refined in *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). The Sixth Circuit has explained the operation of the *Anderson-Burdick* framework as follows:

> First, we determine the burden the State's regulation imposes on the plaintiffs' First Amendment rights. When States impose "reasonable nondiscriminatory restrictions[,]" courts apply rational basis review and " 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547, (1983)). But when States impose severe restrictions, such as exclusion or virtual exclusion from the ballot, strict scrutiny applies. *Id.* at 434, 112 S.Ct. 2059; *Schmitt*, 933 F.3d at 639 ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."). For cases between these extremes, we weigh the burden imposed by the State's regulation against " 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' " *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564).

*Thompson,* 959 F.3d at 808.

The Court begins its analysis under the *Anderson-Burdick* framework by determining the severity of the burden that the State Defendants have placed upon Plaintiffs' constitutional rights.

Here, Plaintiffs argue that the burden placed on them by the challenged regulations is severe, necessitating a strict scrutiny analysis, as was applied by the district courts in *Esshaki* and *SawariMedia*. Defendants, on the other hand, contend that the burden is moderate, necessitating a flexible weighing of the burdens analysis, or "intermediate scrutiny" as was applied in *Thompson.*

As explained below, this Court finds that the facts and circumstances in this case can be readily distinguished from *Esshaki and SawariMedia.* The Court concludes that the burden, under the unique circumstances presented here, is more akin to that in *Thompson* that warranted intermediate scrutiny. Moreover, Plaintiffs' lack of diligence also weighs strongly in favor of applying intermediate scrutiny in this particular case.

The plaintiff in *Esshaki v. Whitmer* was a candidate for the United States Congress in Michigan's Eleventh Congressional District. *Esshaki v. Whitmer*, 2020 WL 1910154 (E.D. Mich. April 20, 2020). Under Michigan's election law, the plaintiff needed to collect 1,000 valid signatures by April 21, 2020 in order to qualify for the August 4, 2020, primary ballot. As of the time that Governor Whitmer issued her March 23, 2020 Stay-at-Home Order, the plaintiff had collected 700 signatures. The plaintiff claimed that, for practical purposes, the Stay-at-Home Order denied him the opportunity to collect the remaining signatures that he needed during the time period from March 23rd to April 21st. He filed suit, claiming that strict enforcement of the signature requirement and filing deadline, under the circumstances presented, violated his constitutional rights. The district court analyzed the claim under the *Anderson-Burdick* framework and concluded that the combination of the State's ballot-access statutes and the Governor's Stay-at-Home Order, under the circumstances presented, placed a severe burden on the plaintiff's constitutional rights.

On appeal, the United States Court of Appeals for the Sixth Circuit held that the district court properly applied the *Anderson-Burdick* framework and "correctly determined that the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Order imposed a severe burden" on the plaintiff's ballot access under the circumstances

14

presented in that case. *Esshaki v. Whitmer*, __ F. App'x __, 2020 WL 2185553 (6th Cir. May 5, 2020).

Notably, the plaintiff in *Esshaki* acted with reasonable diligence in seeking to meet the States's requirements by the deadline. At the time that the Stay-at-Home Order was issued, the plaintiff had already collected 700 of the 1,000 required signatures (70%). In addition, after the Stay-at-Home Order was issued, the plaintiff made efforts to obtain signatures by using a mail-based campaign. And as the Sixth Circuit later explained in a subsequent election case, it was significant in *Esshaki* that the "Michigan's stay-at-home orders remained in place through the deadline" for submitting the petition at issue. *Thompson,* 959 F.3d at 809. "So Michigan abruptly prohibited the plaintiffs from procuring signatures during the last month before the deadline, leaving them with only the signatures that they had gathered to that point." *Id*. As such, the answer to the question of whether a reasonably diligent candidate could be expected to satisfy the signature requirements under those circumstances would be "no."

The plaintiff in *SawariMedia* is an organization that wishes to place an initiative on Michigan's 2020 general election ballot. In order to do so, Michigan's ballot-access statutes require the plaintiff to obtain 340,047 signatures on an initiative petition that was to be filed with Michigan's Secretary of State no later than May 27, 2020. By early March, the plaintiff was "well on its way to collecting a sufficient number of signatures to place its initiative on the November 2020 general election ballot." *SawariMedia LLC, supra,* at *3. "At that time, it had 'collected approximately two-hundred fifteen thousand (215,000) valid signatures' in support of the initiative – an average of over 22,000 per week." *Id.* From March 23, 2020 through the end of the plaintiff's filing deadline of May 27, 2020, Governor Whitmer's Stay-at-Home Order

15

restricted the plaintiff from gathering signatures in person. Nevertheless, during that time period, the plaintiffs attempted to collect signatures via mail. When those efforts proved unsuccessful, in early May 2020, the plaintiff filed suit against the state defendants seeking a preliminary injunction. The district court concluded that Michigan's ballot-access requirements, combined with the restrictions in the Governor's Stay-at-Home Order, imposed a severe burden on the plaintiff under the circumstances presented, warranting a strict scrutiny analysis. The district court concluded that the "root cause" of the plaintiff's inability to meet the ballot-access requirements was state action (ie, the Governor's order that prevented the plaintiff from continuing to gather the required signatures during the last two months of the time period at issue). The district court concluded that the State's requirements did not survive a strict scrutiny analysis and granted the requested preliminary injunction, enjoining the defendants from excluding the plaintiff's ballot initiative from the ballot "on the basis that the plaintiff did not collect 340,047 valid signatures by the May 27, 2020, filing deadline." *Id*. at *15. As was the case in *Esshaki*, the answer to the question of whether a reasonably diligent candidate could be expected to satisfy the signature requirements under those circumstances would be "no."

The plaintiffs in *Thompson v. Dewine* were individuals and organizations that were obtaining signatures in support of initiatives to amend Ohio's constitution and proposed municipal ordinances. They brought suit, challenging the state's enforcement of its ballot-initiative requirements during the pandemic as violative of their constitutional rights. "The district court held that Ohio's strict enforcement of its ballot initiative regulations imposed a severe burden" on the plaintiffs' constitutional rights, given the pandemic. *Id*. at 809.

The Sixth Circuit reversed, concluding that the burden on the plaintiffs was not severe,

for several reasons. First, the court noted that in *Esshaki,* "Michigan's stay-at-home orders remained in place through the deadline for the petition submission," whereas the plaintiffs in the case at bar still had time to gather signatures. Second, the court noted that unlike Ohio's stay-at-home orders, the Michigan Stay-at-Home Order at issue in *Esshaki* "did not specifically exempt First Amendment protected activity." *Id*. at 809. The court found that "Ohio's express exemption (especially for 'petition or referendum circulators' specifically)" was "vitally important." *Id.* Third, the court noted that Ohio was beginning to lift its restrictions, and explained that "the five-week period from Ohio's rescinding of its order until the deadline to submit an initiative petition undermines Plaintiffs' argument that the State has excluded them from the ballot." *Id*. at 810.

The court further considered, and rejected, the notion that a severe burden exists because the plaintiffs could not obtain as many signatures for their petitions as they would without the pandemic:

> Plaintiffs' claim effectively boils down to frustration over failing to procure as many signatures for their petitions (because of social distancing and reduced public crowds) as they would without the pandemic. But that's not necessarily true. There's no reason that Plaintiffs can't advertise their initiatives within the bounds of our current situation, such as through social or traditional media inviting interested electors to contact them and bring the petitions to the electors' homes to sign. Or Plaintiffs could bring their petitions to the public by speaking with electors and witnessing the signatures from a safe distance, and sterilizing writing instruments between signatures.
>
> Moreover, just because procuring signatures is now harder (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are excluded from the ballot. And we must remember, First Amendment violations require state action. U.S. Const. amend. I ("Congress shall make no law...." (emphasis added)); 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State...." (emphasis added)). So we cannot hold private citizens' decisions to stay home for their own safety against the State. Because the State has not excluded Plaintiffs from the ballot, the burden imposed

on them by the State's initiative requirements cannot be severe. *See Schmitt*, 933 F.3d at 639.

*Id.* at 810.

The Sixth Circuit concluded that, "[c]onsidering all opportunities Plaintiffs had, and still have, to exercise their rights in our calculation of the burden imposed by the States' regulations," Plaintiffs' "burden is less than severe." *Id*. at 810. The Sixth Circuit concluded that the burden was "intermediate." *Id*. at 810-11.

Under the facts and circumstances presented here – considered in totality – the burden on continuing to require Plaintiffs to meet the court-amended signature and filing requirements that exist in Michigan is not severe. Notably, and in sharp contrast to the plaintiffs in both *Esshaki* and *SawariMedia*, Plaintiffs have not been diligent in the exercise of their rights.

Considering all the opportunities that Plaintiffs have had since they announced their intention to run in January, the actions they could have taken during the limited time period wherein the Governor's Stay-at-Home Order precluded certain actions, and the opportunities they have had (and continue to have) to gather signatures after the State lifted its restrictions, the burden is not severe. A reasonably diligent candidate could be expected to satisfy Michigan's requirements under these facts and circumstances.

Given the July 16 deadline for filing a qualifying petition (Mich. Comp. Laws § 168.590c(2)), and the requirement that signatures cannot be older than 180 days before the petition is filed (Mich. Comp. Laws §168.590b(3)), Kishore had a window of time from January 18, 2020 to July 16, 2020 to obtain the required signatures.

Plaintiffs announced their candidacy in January of 2020. To date, however, Plaintiffs have not prepared a qualifying petition that could be used to gather signatures in support of

18

Kishore's candidacy. Thus, while the filing deadline is now less than two weeks away, Plaintiffs have not even undertaken the most basic first step towards getting on the ballot in Michigan – preparing a qualifying petition to circulate in order to collect signatures in support of Kishore's candidacy.

Plaintiffs have offered no rational explanation as to why they have not prepared a qualifying petition since deciding to run in January of 2020. Plaintiffs have likewise offered no explanation as to why no signatures in support of Kishore's candidacy were gathered during the month of January.

During the month of February of 2020, Plaintiffs held various in-person campaign events in Michigan. For example, the "first public campaign event" was held at the University of Michigan in Ann Arbor, Michigan on February 24, 2020. On February 27th, a second public campaign meeting was held at Wayne State University in Detroit. (Kishore Affidavit). Plaintiffs claim that those events were promoted widely at both campuses and also at workplaces and public locations in the surrounding areas. (*Id*.). Nevertheless, Plaintiffs did not obtain *a single signature* on a qualifying petition for Kishore during any of those in-person events, *or at any other time during the entire month of February.*

From March 3rd through March 5th, 2020, Kishore was in California for out-of-state campaign meetings but then returned to Michigan. During the first week of March, Plaintiffs made the decision to cease all campaign activity and take no action to obtain signatures for a qualifying petition for Kishore. Kishore states that his *"campaign decided to cancel all subsequent public events and campaign activity, including ballot gathering initiatives,* in order to protect volunteers, staff and the public at large from spreading the coronavirus." (Kishore

Affidavit at 2) (emphasis added).

At that time, Plaintiffs had still not collected *a single signature* in support of Kishore's candidacy. Significantly, this was *before* the State had issued any executive orders or its Stay-at-Home Order, in relation to the pandemic. As the Sixth Circuit explained in *Thompson,* "First Amendment violations require state action," and so "we cannot hold private citizens' decisions to stay home for their own safety [or the safety of others] against the State." *Thompson*, 959 F.3d at 810. Thus, the Kishore campaign's own decision to cease its campaign activity and forgo any ballot gathering initiatives, made prior to the State having issued any executive orders, cannot be held against the State.

The earlier executive orders that the Governor issued in response to the pandemic (issued between March 13th and 19th ) did not prohibit petition circulation and included the Constitutional Exemption Language. Thus, Plaintiffs were not prohibited from gathering signatures during that time period.

The Stay-at-Home Order, however, did not include the Constitutional Exemption Language and served as an impediment to the in-person gathering of signatures in public in Michigan during the time period from March 23, 2020 through May 15, 2020.

By the time that this occurred, the plaintiff in *Esshaki* had gathered 70% of the signatures he needed. Likewise, the plaintiff in *SawariMedia* was "well on its way" to obtaining the signatures required of it, having obtained more than 60% of the signatures needed. In contrast, Plaintiffs had not prepared a qualifying petition or obtained a single signature before the Governor's Stay-at-Home Order went into effect.

And unlike the plaintiffs in *Esshaki and SawariMedia,* Plaintiffs failed to take any

actions in order to attempt to obtain signatures during that limited time period during which the State's Stay-at-Home Order appeared[6] to preclude the in-person collection of signatures.  For example, the plaintiff in *Esshaki* made efforts to obtain signatures by virtue of a mail-based campaign and obtained some signatures in that manner.  As the State Defendants note, "Plaintiffs could have been mailing petition sheets to registered voters, who then sign the sheet as a voter, and then as a circulator.  The completed sheets can then be mailed back to Plaintiffs, dropped off, or picked up by Plaintiffs or their volunteers."  (Defs.' Br. at 16).  But Plaintiffs made no attempt to gather any signatures via mail, or any other manner, during this time period.

And significantly, Plaintiffs' filing deadline is *three months later* than the one in *Esshaki* and *two months later than* the deadline *in SawariMedia*.  Thus, Plaintiffs are not in the same position as the plaintiffs in those cases – where the State's Stay-at-Home Order remained in place *through the deadline for petition submission.*[7]

To the contrary, as of early June, opportunities for in-person signature collection in Michigan significantly increased with the Governor's lifting of various restrictions.  That means Plaintiffs have had approximately a month and a half before the July 16, 2020 deadline during

---

[6]Defendants stress that even though the Stay-at-Home Order did not expressly exempt constitutionally protected activities, the orders were "interpreted" to allow for those activities. (Defs.' Br. at 4).  This "interpretation" was found on the State of Michigan's website in a "frequently asked questions" document.  But as the Sixth Circuit highlighted in *Thompson*, while "executive officials in Michigan informally indicated [in the FAQ's] that they would not enforce [the Stay-at-Home Order and the extensions of that order] against those engaged in protected activity .... that promise is not the same thing as putting the restriction in the order itself." *Thompson*, 959 F.3d at 809-10.

[7]And as the State Defendants note, "Plaintiffs' requirement of at least 12,000 valid signatures, already a significantly reduced number, is minuscule compared to the requirement challenged in *SawariMedia*" of 340,047 signatures.  (Defs.' Br. at 19).

which they could continue to obtain signatures.  That remaining time period greatly undermines Plaintiffs' argument that the State has excluded them from the ballot.  *Thompson, supra*, at 810 (finding five-week period from Ohio's rescinding of its order until the deadline at issue undermines the plaintiffs' argument that the State excluded them from the ballot).

And while the pandemic is not over, there is no reason that Plaintiffs could not advertise and promote their candidacy "within the bounds of the situation presented," such as "through social or traditional media inviting interested electors to contact them and bring the petitions to the electors' homes to sign" or Plaintiffs could bring Kishore's petition "to the public by speaking with electors and witnessing the signatures from a safe distance, and sterilizing writing instruments between signatures."[8]  *Thompson,* 959 F.3d at 810.  That is especially so given that Plaintiffs acknowledge that they have access to the "World Socialist Web Site (wsws.org), the political organ of the SEP and its sister parties worldwide," which Plaintiffs note "is the most widely-read socialist publication on the Internet" and which was "accessed by 3.2 million unique visitors between January 1 and April 26, 2020."  (Compl. at ¶ 7).  Indeed, "Plaintiffs announced their candidacies in an online video on January 26, 2020 (accessible at socialism2020.org)."  There is no reason why Plaintiffs could not attempt to gather signatures in the ways noted above had they used the existing platforms available to them.

But, as Plaintiffs' counsel advised during the hearing, Plaintiffs have decided not to attempt to gather any signatures even after the Governor lifted the restrictions.  Plaintiffs have

---

[8]The pandemic has inspired new ways of doing many things while maintaining social distancing.  For example, this Court has held drive-through ceremonies in a parking structure to swear in new citizens, whereby the person to be sworn in drives up to a podium in their vehicle and is administered the oath of allegiance by a judge standing six feet away and wearing a protective face mask. *See* https://uscourts.gov/news/2020/06/18/new-road-citizenship-detroit.

Case 2:20-cv-11605-SFC-DRG  ECF No. 17  filed 07/08/20  PageID.228  Page 23 of 26

made that decision because they fear that doing so could endanger the health of their campaign staff or members of the public.  While the Court appreciates that Plaintiffs have made a conscientious choice to not attempt to gather signatures both before any executive orders were issued, and after the restrictions in the Stay-at-Home Order were lifted, that is their own choice. Plaintiffs' voluntary decisions cannot be attributed to the State.  Thus, unlike *SawariMedi*a, the "root cause" of Plaintiffs' inability to meet the State's ballot-access requirements is not *state action*.  Plaintiffs gathered the same amount of signatures both before and after the Governor's Stay-at-Home Order as they did during the time period the restrictions were in effect – none.

"At bottom, a severe burden excludes or virtually excludes electors from the ballot." *Thompson,* 959 F.3d at 809.  Plaintiffs have not shown that Michigan's ballot-access requirements, combined with the Governor's executive orders, exclude or virtually exclude them from the ballot.  A reasonably diligent candidate could be expected to satisfy the State's ballot-access requirements under these circumstances – where Plaintiffs had a six-month period to meet an already-reduced requirement of 12,000 signatures and where the Governor's Stay-at-Home Order only restricted them from gathering signatures in-person during the middle third of that time period.

Under these unique circumstances, the Court concludes that the burden on these Plaintiffs is somewhere between the minimal and severe burdens discussed in *Anderson* and *Burdick* and, therefore, intermediate scrutiny should be applied.

Whether this intermediate burden on Plaintiffs' rights "passes constitutional muster depends on whether the State has legitimate interests to impose the burden that outweigh it." *Thompson,* 959 F.3d at 811.

Defendants assert that the numerical signature requirement and the geographical distribution requirements advance the important interests of avoiding voter confusion, ballot overcrowding, and frivolous candidacies by requiring Plaintiffs to demonstrate they have "a significant modicum of public support for candidacies from voters within roughly half the State of Michigan." (Defs.' Br. at 25-26).

As to the July 16 deadline, Defendants note that states have the power to prescribe time, place, and manner restrictions for holding elections. They assert that the deadline the State has chosen, "as demonstrated by Director Brater's Declaration" filed in this case, "is part of a carefully constructed set of election deadlines extending backwards from the date of the election:"

> In the 50 days between the July 16 filing deadline and the September 4 deadline for the Board of State Canvassers to certify qualifying petitions, the Bureau of Elections must conduct a face review of all petition sheets filed by any and all candidates with the Secretary of State and review and resolve any challenges to signatures filed by interested parties. The Bureau must complete these tasks two days before the September 4 deadline so that staff reports for all candidates may be published. (Ex. A, Brater Dec., ¶¶ 4-11.) Once the Board certifies petitions on September 4, and the Secretary of State certifies the slate of candidates to the county clerks the same day, the ballot proofing and printing process begins. This process is rather complex and generally must be completed by September 19, 2020, so that county election commissions can deliver absent voter ballots to the county clerks, who in turn must deliver absent voter ballots to the local clerks by September 21, 2020, so that delivery to voters, including military and overseas voters, may commence. (*Id.*, ¶¶ 12-18.) Interfering with the July 16 filing deadline threatens the ability of election officials to meet the important deadlines that follow. *Thompson*, 959 F.3d at 813 ("[R]ewriting a state's election procedures or moving deadlines rarely ends with one court order. Moving one piece on the game board invariably leads to additional moves.").
> The July 16 deadline reflects a necessary cog in Michigan's election machinery that keeps the process running in an orderly manner. The Sixth Circuit has recognized that "easing administrative burdens" on elections officials is "undoubtedly '[an] important regulatory interest[ ].' " *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (citation omitted). The filing deadline advances that important regulatory interest by ensuring that the Secretary of State

and her staff have sufficient time to canvass qualifying petitions, provide a
challenge period, and meet the ballot certification deadline of September 4, which
triggers final preparations for ballot printing by the counties.

On balance, and under the circumstances, requiring proponents like
Plaintiffs to continue to meet their signature and filing deadlines is not an
unconstitutional burden.

(Defs.' Br. at 26-28). These are clearly legitimate interests.

The State's well-established and legitimate interests in administering its candidate

eligibility and ballot access requirements outweigh the intermediate burden those regulations

place on Plaintiffs. As such, the State Defendants are likely to prevail on the merits of Plaintiffs'

constitutional claims.

## II.     The Remaining Factors

"Unless a statute is unconstitutional, enjoining a 'State from conducting [its] elections

pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm [the

State].' *Abbott v. Perez*, __ U.S. __, 138 S.Ct. 2305, 2324, 201 L.Ed.2d 714 (2018)."

*Thompson*, 959 F.3d at 812. Here, the State Defendants have shown that they are likely to

prevail on the merits as to Plaintiffs' constitutional claims. Serious and irreparable harm will

thus result if Michigan "cannot conduct its elections in accordance with its lawfully enacted

ballot-access regulations." *Id*. And Plaintiffs have not shown that complying with regulations

that this Court finds are likely constitutional as applied to them will harm them. As such, the

balance of the equities favors the State Defendants. And as was the case in *Thompson*, "giving

effect to the will of the people by enforcing the laws they and their representatives enact serves

the public interest. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir.

2006)." *Id.*

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Plaintiffs' Motion for Preliminary

Injunction is DENIED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  July 8, 2020