IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF PENNSYLVANIA; THE CONSTITUTION PARTY OF PENNSYLVANIA; GREEN PARTY OF PENNSYLVANIA; STEVE SCHEETZ; KEVIN GAUGHEN; ALAN SMITH; TIMOTHY RUNKLE; BOB GOODRICH; and JUSTIN MAGILL, | : : : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 20-2299 |
| v. | : : | |
| TOM WOLF, in his official capacity of Governor of the Commonwealth of Pennsylvania; KATHY BOOCKVAR, in her official capacity as Secretary of the Commonwealth of Pennsylvania; and JONATHAN M. MARKS, in his official Capacity as Deputy Secretary for Elections and Commissions, | : : : : : : : : | |
| Defendants. | : : | |

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                                                    July 14, 2020

Federal courts must act with great constraint when considering the prospect of intervening to change state election rules, issues normally best left to the people and their representatives.  The plaintiffs, third party political bodies, their supporters, and potential political candidates for state and nationally elected offices, move for the extraordinary remedy of a temporary restraining order or preliminary injunction against state officials in light of the exceptional circumstances unleashed by the novel coronavirus pandemic. However difficult it may be in ordinary times to satisfy the court-imposed signature requirements to get a political body candidate on the general election ballot, the plaintiffs argue that under current circumstances, the in-person signature requirements,

combined with the Governor's various stay at home orders and social distancing restrictions, impose a severe burden that effectively violates their First and Fourteenth Amendment rights. While the stay at home orders no longer remain in effect, large public gatherings remain banned, and as a result of the state's restrictions, the plaintiffs maintain that they are entitled to automatic placement on the November ballot.

In resolving this motion for a temporary restraining order or preliminary injunction, the court must navigate the intricate and complex balance between the plaintiffs' First and Fourteenth Amendment rights during a public health crisis, and the state's valid interests in protecting the integrity of its ballot and ensuring that all candidates receive a modicum of support. After thoroughly reviewing all evidence in the record and considering the parties' and intervenor's arguments in support of their respective positions, the court finds that the plaintiffs have not met their high burden of showing that they are entitled to mandatory injunctive relief in the form of automatic ballot placement. The plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims, and, moreover, the court should not be dictating to the state how it should conduct its own election. Accordingly, the court will deny the emergency motion for a temporary restraining order or preliminary injunction.

## I.     PROCEDURAL HISTORY

The plaintiffs, Libertarian Party of Pennsylvania ("LPPA"), Green Party of Pennsylvania ("GPPA"), Constitution Party of Pennsylvania ("CPPA"), Steve Scheetz, Kevin Gaughen, Alan Smith, Timothy Runkle, Bob Goodrich, and Justin Magill, commenced this action against the defendants, Tom Wolf ("Governor Wolf"), Kathy Boockvar ("Secretary Boockvar"), and Jonathan M. Marks ("Deputy Secretary Marks"), on May 14, 2020. Doc. No. 1. In the complaint, the plaintiffs seek the court's relief in declaring unconstitutional, enjoining and/or modifying

Pennsylvania's in-person signature collection and witnessing requirements for Minor Political Party and Political Body candidates that are seeking to qualify for the November 3, 2020 general election. Compl. at ¶ 1. The plaintiffs aver that they bring this action in light of the current public health emergency caused by the coronavirus pandemic (COVID-19) and Governor Wolf's various emergency orders, which effectively shut down the Commonwealth for a period of time. *Id.*

The plaintiffs bring their claims under the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *Id.* at ¶¶ 84–98. As relief, the plaintiffs seek a temporary restraining order and/or preliminary injunction, a declaratory judgment holding that, in light of the current public health emergency caused by the novel coronavirus and executive orders requiring that Pennsylvania citizens stay at home, Pennsylvania's supporting signature requirements for Minor Political Party and Political Body candidates for office cannot be constitutionally enforced under the First and Fourteenth Amendments, a permanent injunction, and an order that the defendants pay the plaintiffs their costs and reasonable attorney's fees under 42 U.S.C. § 1988(b). *Id.* at pp. 26–27.

On May 19, 2020, the plaintiffs filed a separate motion for a temporary restraining order/preliminary injunction against all defendants. Doc. No. 3. In the motion, the plaintiffs sought the following relief:

> [A] temporary restraining order and/or a preliminary injunction that prohibits Defendants from enforcing the provisions of the Pennsylvania Election Code that require Plaintiffs, as a condition of qualifying for the general election ballot, to collect a specified number of voters' signatures on nomination papers during a period extending from February 19, 2020 until the filing deadline of August 3, 2020. Plaintiffs specifically request that the Court enjoin Defendants from enforcing 25 Pa. Stat. Ann. §§ 2911 (petitioning requirement) and 2913(b) – (c) (petition circulation period) as applied to Plaintiffs in the 2020 election cycle. Further, Plaintiffs request that the Court direct Defendants to: (1) accept Plaintiffs LPPA's, CPPA's and GPPA's candidates' nomination papers for the November 3, 2020 general election without requiring supporting signatures from voters; and (2)

place Plaintiffs LPPA's, CPPA's and GPPA's candidates on Pennsylvania's November 3, 2020 general election ballot.

Pls.' Emergency Mot. for TRO and Prelim. Inj. at 1–2, Doc. No. 3 (footnote omitted).

The following day, the court entered an order scheduling a telephone conference to discuss the motion for a temporary restraining order/preliminary injunction on May 27, 2020. Doc. No. 4. On May 27, 2020, the Pennsylvania Democratic Party ("PADEMS") moved to intervene in the case. Doc. No. 12. The same day, the plaintiffs filed opposition to the motion to intervene. Doc. No. 13. The court then held the telephone conference to discuss scheduling related to the motion for a temporary restraining order/preliminary injunction. After this conference, the court entered an order which, *inter alia*, (1) scheduled another telephone conference with the parties and the proposed intervenor for June 3, 2020 and (2) granted the defendants until June 12, 2020 to respond to the motion for temporary restraining order/preliminary injunction. May 28, 2020 Order at 1, Doc. No. 15.

On June 3, 2020, the PADEMS filed a supplemental brief in support of its motion to intervene, and the defendants separately filed their response to the motion to intervene. Doc. Nos. 18, 19. The court also held its scheduled telephone conference, and following the conference, the court entered another order which set scheduling deadlines for the various parties. June 4, 2020 Order at 1–2, Doc. No. 21. The court also set a hearing date (via video) on the emergency motion for temporary restraining order and preliminary injunction, as well as on any other pending motions for June 24, 2020. *Id.* at 2.

The PADEMS filed its proposed answer to the complaint on June 5, 2020. Doc. No. 22. The same day, the defendants filed a motion to dismiss for failure to state a claim. Doc. No. 23. On June 8, 2020, the plaintiffs filed their response in opposition to the PADEMS' answer to the complaint and motion to intervene. Doc. No. 24. Both the PADEMS and the defendants filed their

opposition to the motion for temporary restraining order/preliminary injunction on June 12, 2020. Doc. Nos. 25, 28. The same day, the plaintiffs filed their opposition to the defendants' motion to dismiss. Doc. No. 26. The court also rescheduled the video conference hearing on the motion for temporary restraining order/preliminary injunction, as well as on any other pending motions, for June 23, 2020. June 12, 2020 Order at 1, Doc. No. 27.

On June 19, 2020, the plaintiffs filed their reply in support of their motion for temporary restraining order/preliminary injunction. Doc. No. 31. The same day, the defendants filed their reply brief in support of the motion to dismiss. Doc. No. 32. The plaintiffs, on June 22, 2020, filed a notice of supplemental authority, updating the court on recent legal developments on similar issues in other districts. Doc. No. 33. On the same date, the court also held a telephone conference with the parties to discuss logistics pertaining to the evidentiary hearing scheduled for the following day. Doc. No. 34.

On June 23, 2020, the court held the evidentiary hearing on the motion for temporary restraining order/preliminary injunction. Doc. No. 36. The parties also submitted a joint stipulation of facts for the court to consider as evidence in this matter. Doc. No. 35. At the time the evidentiary hearing concluded, the parties still had one more witness to present testimony, so it was agreed that this testimony would be taken by deposition and submitted to the court. After the evidentiary hearing concluded, the court entered a scheduling order regarding the parties filing proposed findings of fact and conclusions of law. June 25, 2020 Order at 1, Doc. No. 37. On June 26, 2020, the defendants filed an unopposed request for oral argument. Doc. No. 38. The court granted this request on June 29, 2020. Doc. No. 40. The same day, and again on the following day, the plaintiffs also submitted notices of supplemental authority. Doc. Nos. 39, 41.

In accordance with the court's June 25, 2020 order, all parties filed their proposed findings of fact and conclusions of law on July 2, 2020. Doc. Nos. 43–45. On July 4, 2020, the plaintiffs once again submitted a notice of supplemental authority. Doc. No. 46. The defendants filed a notice of supplemental authority on July 7, 2020. Doc. No. 47. Additionally, on July 8, 2020, the defendants filed supplemental proposed findings of fact and conclusions of law. Doc. No. 48. The court also granted the PADEMS' motion to intervene. Doc. No. 49. Shortly thereafter, the court held oral argument on the motion for a temporary restraining order/preliminary injunction. Doc. No. 50. The next day, both the PADEMS and the plaintiffs filed notices of supplemental authority. Doc. Nos. 51, 52. The plaintiffs also filed a statement in response to the intervenor's notice of supplemental authority. Doc. No. 53. On July 13, 2020, the plaintiffs filed another notice of supplemental authority. Doc. No. 54. Given that the evidentiary record is now closed, and all parties have argued their positions, the motion for a temporary restraining order/preliminary injunction is now ripe for disposition.

## II.    FINDINGS OF FACT

After carefully considering all of the evidence presented during the evidentiary hearing as well as the evidence introduced and admitted since then, and after assigning such weight to the evidence as the court deemed proper and disregarding the testimony that the court found to lack credibility, the pertinent facts are as follows:

### A.    <u>The Parties</u>

1.     The LPPA is a "Political Body" in Pennsylvania, which seeks to qualify its candidates, on the federal and state level, for Pennsylvania's November 3, 2020 general election ballot. Joint Stipulated Findings of Fact and Conclusions of Law ("Stip.") at ¶ 1, Doc. No. 35.

2.      The LPPA has more than 40,000 registered voters. Tr. of Evidentiary Hr'g on June 23, 2020 ("June 23, 2020 Tr.") at 43:1–6.

3.      The GPPA is "Political Body" in Pennsylvania, which seeks to qualify its candidates, on the federal and state level, for Pennsylvania's November 3, 2020 general election ballot. Stip. at ¶ 2.

4.      The GPPA has 10,000 registered voters. June 23, 2020 Tr. at 120:11–14.

5.      The CPPA is "Political Body" in Pennsylvania, which seeks to qualify its candidates, on the federal and state level, for Pennsylvania's November 3, 2020 general election ballot. Stip. at ¶ 3.

6.      Steve Scheetz, Kevin Gaughen, Alan Smith, Timothy Runkle, Bob Goodrich, and Justin Magill are registered voters in Pennsylvania that are affiliated with the political bodies bringing this suit. Stip. at ¶¶ 4–9; Compl. at ¶¶ 12–13, 15–17, 19–20.

7.      Governor Wolf is Governor of the Commonwealth of Pennsylvania. Stip. at ¶ 10.

8.      Under 35 Pa. C.S. § 7301(c), Governor Wolf has the authority to declare a disaster emergency "upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent." Stip. at ¶ 11.

9.      Secretary Boockvar is the Secretary of the Commonwealth of Pennsylvania. Stip. at ¶ 12.

10.      Secretary Boockvar possesses the authority to, *inter alia*, "determine, in accordance with the provisions of this act, the forms of nomination petitions and papers, expense accounts and all other forms and records, the form of which [s]he is required to determine under the provisions of this act," 25 P.S. § 2621(a), and "receive and determine, as hereinafter provided, the sufficiency of nomination petitions, certificates and papers of candidates for President of the United States,

7

presidential electors, United States senators, representatives in Congress and all State offices, including senators, representatives and judges of all courts of record, and delegates and alternate delegates to National Conventions and members of State committees. *Id.* § 2621(d)." Stip. at ¶ 13.

11. Deputy Secretary Marks is the Deputy Secretary for Elections and Commissions for the Bureau of Commissions, Elections, and Legislation, and he oversees the Commonwealth's electoral process, campaign finance, voter registration, and office of notary public, commissions and legislation. Stip. at ¶¶ 14–15.

12. The court granted the PADEMS, a major political party, permission to intervene in this case. Doc. No. 49.

**B.    Pennsylvania Election Law and Its Application**

13. Candidates in Pennsylvania for the general election are classified into three groups:

    a.    those affiliated with a "Political Party;"

    b.    those affiliated with a "Minor Political Party;" and

    c.    those affiliated with a "Political Body."

Stip. at ¶ 17 (citing 25 P.S. §§ 2831(a), (c), 2872.2(a)).

14. A statewide "Political Party" is "[a]ny party or political body, one of whose candidates at the general election next preceding the primary polled in each of at least ten counties of the State not less than two per centum of the largest entire vote cast in each of said counties for any elected candidate, and polled a total vote in the State equal to at least two per centum of the largest entire vote cast in the State for any elected candidate." Stip. at ¶ 18 (quoting 25 P.S. § 2831(a)).

15. A "Minor Political Party" is a "Political Party" whose statewide registration is less than fifteen percent of the combined statewide registration for all statewide political parties as of

the close of registration for the most recent November election. Stip. at ¶ 19 (citing 25 P.S. § 2872.2(a)).

16.     "Political Bodies" are organizations that did not have a candidate who crossed the two-percent threshold in the last election. Stip. at ¶ 23 (citing 25 P.S. § 2831(c); *Constitution Party of Pa. v. Cortes*, 824 F.3d 386, 390 (3d Cir. 2016)).

17.     Candidates of a "Political Body" do not circulate nomination petitions to appear on a primary ballot or participate in primary elections. Instead, to appear on the general election ballot, candidates of a "Political Body" must circulate nomination papers and attain a requisite number of valid signatures. Stip. at ¶ 24 (citing 25 P.S. § 2911(a)).

18.     Major Parties select their nominees by means of taxpayer-funded primary elections. Compl. at ¶ 4 (citing 25 P.S. §§ 2645(a), 2861(a)).

19.     Major Party candidates could begin circulating and filing nomination petitions to appear on a primary ballot on January 28, 2020, and they had until February 18, 2020 to circulate and file nomination petitions. Compl. at ¶ 31; Stip. at ¶ 22 (citing 25 P.S. §§ 2867, 2868, 2872.1).

20.     Major Party candidates who then win in the primary election automatically qualify for placement on the ballot in the general election. Compl. at ¶ 4 (citing 25 P.S. § 2862).

21.     Given that the last day for Major Party candidates to circulate and file nomination petitions for the primary ballot was February 18, 2020, and Governor Wolf did not announce the emergency stay at home orders until March 2020, the stay at home orders did not impact the ability of Major Party candidates to obtain signatures and appear on the primary ballot. Compl. at ¶ 31; Stip. at ¶¶ 44-59; June 23, 2020 Tr. at 170:6–14; Dep. Testimony of Jason Henry ("Henry Dep.") at 59:9–16.

22.     For the 2020 general election, "Political Body" candidates can collect signatures and file nomination papers between February 19, 2020 and August 3, 2020. Stip. at ¶¶ 35–36.

23.     If a circulator obtains more than just the circulator's own signature, the signatures must be delivered to elections officials in its original form as copies are not permitted. June 23, 2020 Tr. at 171:18–172:2.

24.     Nomination papers that are signed, scanned, and then emailed are not permitted. June 23, 2020 Tr. at 171:18–172:2.

25.     Pursuant to Act 77 of 2019, which became law on October 31, 2019, nomination papers do not require a notarized affidavit. Stip. at ¶ 37 (citing 25 P.S. § 2911(d)).

26.     Nomination petitions papers must be printed on legal sized (8.5" x 14") paper and printed double sided and head-to-head, or they will not be accepted by the Secretary of the Commonwealth. Henry Dep. at 56:8–22; June 23, 2020 Tr. at 17:13–22.

27.     The court's February 1, 2018 order in *Constitution Party v. Aichele*, Civ. A. No. 12- 2726, Doc. No. 115 (E.D. Pa. Feb. 1, 2018), established new signature requirements for "Political Body" candidates. Stip. at ¶ 27.

28.     For the November 3, 2020 general election, the signature requirements applicable to "Political Body" candidates for the statewide offices on the ballot are:

    a.      President of the United States: 5,000

    b.      Treasurer: 2,500

    c.      Auditor General: 2,500

    d.      Attorney General: 2,500

Stip. at ¶ 28 (citing Feb. 1, 2018 Order, *Constitution Party v. Aichele*, Civ. A. No. 12-2726 (E.D. Pa.), Doc. No. 115).

## C.    The COVID-19 Pandemic and Response

29.     On January 30, 2020, the World Health Organization declared that COVID-19 constitutes a public health emergency of international concern. Compl. at ¶ 29; *see* WHO Director-General's Statement on IHR Emergency Committee on Novel Coronavirus (2019-nCoV), World Health Organization (Jan. 30, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov).

30.     On March 6, 2020, Governor Wolf proclaimed the existence of a disaster emergency throughout the Commonwealth of Pennsylvania pursuant to 35 Pa. C.S. § 7301(c). Stip. at ¶ 42; *see* Proclamation of Disaster Emergency, https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf.

31.     On March 13, 2020, President Donald J. Trump declared a national emergency due to the COVID-19 outbreak in the United States. Compl. at ¶ 36; *see* Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, The White House (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

32.     On March 23, 2020, Governor Wolf issued a stay at home order effective until April 6, 2020, stating:

> "All individuals residing in Allegheny County, Bucks County, Chester County, Delaware County, Monroe County, Montgomery County, and Philadelphia County are ordered to stay at home except as needed to access, support, or provide life sustaining business, emergency, or government services. . . . Individuals leaving their home or place of business to access, support, or provide life sustaining services for themselves, another person, or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention. Individuals are permitted to engage in outdoor activities; however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining services . . . ."

Stip. at ¶ 44 (citing Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home, March 23, 2020, *available at*: https://www.scribd.com/document/452929592/03-23-20-TWW-COVID-19-Stay-at-Home-Order (emphasis omitted in original)).

33.     From March 23, 2020 through March 31, 2020, Governor Wolf amended his stay at home order several times to include additional counties. Stip. at ¶ 45.

34.     On April 1, 2020, Governor Wolf issued a statewide stay at home order, which was effective until April 30, 2020. Stip. at ¶ 45.

35.     On April 22, 2020, Governor Wolf instituted a process to "reopen Pennsylvania" with May 8, 2020 as the targeted start date. The reopening plan classified counties as being in a red phase, a yellow phase, or a green phase. Stip. at ¶ 46 (citation omitted).

36.      On May 15, 2020, a total of 37 counties were in the yellow phase of reopening. Stip. at ¶ 51.

37.      On May 22, 2020, a total of 49 counties were in the yellow phase of reopening. Stip. at ¶ 53.

38.     On May 29, 2020, the Governor lifted the stay at home order in an additional eight counties by moving the counties of Dauphin, Franklin, Huntingdon, Lebanon, Luzerne, Monroe, Pike, and Schuylkill into the yellow phase of reopening. Stip. at ¶ 54 (citation omitted).

39.     On June 5, 2020, Governor Wolf lifted the stay at home order in all remaining counties as ten additional counties moved to the yellow phase. Stip. at ¶ 55 (citation omitted).

40.     On May 29, 2020, a total of 18 counties were in the green phase of reopening and 39 counties were in the yellow phase of reopening. Stip. at ¶ 57.

41.     By June 5, 2020, the stay at home order had been lifted in all counties, with 34 in the green phase and 33 in the yellow phase. Stip. at ¶ 59.

42.    On June 12, 2020, a total of 46 counties were in the green phase and 21 were in the yellow phase. Stip. at ¶ 61.

43.    On June 19, 2020, a total of 54 of the 67 counties in Pennsylvania were in the green phase. Stip. at ¶ 63.

44.    The Governor also issued guidance titled "Guidance for Businesses Permitted to Operate During the COVID-19 Disaster Emergency to Ensure the Safety and Health of Employees and the Public" ("Business Guidance") which notes, *inter alia*, that "[a]ll businesses in all industries and sectors of the economy (including non-profit entities) in the Commonwealth, which are permitted to conduct in-person operations, are subject to this guidance." *See* App. of Executive Order and Governmental Communication Exs. to Parties' Jt. Stipulated Findings of Fact and Conclusions of Law ("App."), Ex. 4, Business Guidance at p. 2;[1] Stip. at ¶ 64.

45.    In the yellow phase, people must still maintain a six-foot distance from others and crowds of over 25 people are not permitted. Compl. at ¶¶ 48–49; *see* App., Ex. 3, Process to Reopen Pennsylvania ("Process to Reopen") at p. 10 ("All Pennsylvanians should continue to maintain social distancing even as the reopening and easing of restriction process begins. With few exceptions, Pennsylvanians should maintain a distance of six feet from each other, gatherings of more than 25 people will be prohibited, and non-essential travel should be avoided.").

46.    In the yellow phase, indoor recreation, health and wellness facilities, or personal care services are not permitted. *See* Process to Reopen at 18.

47.    In the green phase, businesses must still fully comply with all substantive aspects of previous orders from the Secretary of Health and guidance from the Wolf Administration, the Department of Health, the Centers for Disease Control and Prevention, and all existing and future

---

[1] The parties provided the court with this appendix by hand delivery. To date, they have not docketed the appendix.

applicable guidance issued by the Wolf Administration. *See* App., Ex. 10, Governor Wolf's May 27, 2020 Order ("Governor Wolf's May 27, 2020 Order") at § 1.B.

48.     In the green phase, gatherings of more than 250 people for a planned or spontaneous event are prohibited. *See* Governor Wolf's May 27, 2020 Order at § 1.G.

49.      In the green phase counties, people must still maintain social/physical distancing of six feet. *See* May 4, 2020 Guidance for Businesses Permitted to Operate During the COVID-19 Disaster Emergency to Ensure the Safety and Health of Employees and the Public, (updated July 1, 2020), https://www.governor.pa.gov/covid-19/business-guidance/ ("In all phases, we must . . . keep our physical distance of six feet or more.").

50.     In the green phase, businesses that were conducting in-person operations during the yellow phase may operate at 75% of the maximum capacity stated on the certificate of occupancy and are required to enforce social distancing. *See* Governor Wolf's May 27, 2020 Order at § 1.C.

51.     In the green phase, businesses that were not conducting in-person operations during the yellow phase may operate at 50% of the maximum capacity stated on the certificate of occupancy and are required to enforce social distancing. *See* Governor Wolf's May 27, 2020 Order at § 1.D.

52.     None of the executive orders issued by Governor Wolf explicitly prohibited or restricted signature gathering. *See* App., Exs. 2, 4-12.

### D.     The Plaintiffs' Signature Collection Efforts

53.     Four officers of the plaintiffs testified about their signature collection efforts, and these four witnesses all have substantial experience collecting signatures. June 23, 2020 Tr. at 9:2–9, 37:2–12, 97:12–16, 108:16–109:6.

54.     According to the testimony, the plaintiffs have traditionally relied on festivals and other large gatherings in the past to collect the needed signatures to place candidates on ballots. June 23, 2020 Tr. at 97:17–98:7, 110:1–15.

55.     As a result of the prohibition on large gatherings, numerous municipal, government, and other planned events and festivities such as parades and fireworks displays have been canceled. June 23, 2020 Tr. at 20:17–25, 110:16–22, 113:6–9, 122:14–18.

56.     Governor Wolf's ban on large gatherings in Pennsylvania, which began on March 23, 2020, has resulted in continuing cancelations of large events that have in the past been used by the plaintiffs to successfully gather signatures and that they planned to use to collect signatures during the current election cycle. June 23, 2020 Tr. at 20:17–25, 80:17–81:6, 110:16–22, 113:6–9, 122:14–18.

57.     The plaintiffs and their candidates testified that they have attempted to collect signatures for their campaigns in order to appear on the Pennsylvania 2020 general election ballot, but they have not been able to collect the requisite numbers needed. June 23, 2020 Tr. at 16:10–16, 119:20–120:1.

58.     Jennifer Lynne Moore, the Eastern Vice Chair of LPPA, admitted that neither she nor the LPPA were actively using social media to collect signatures. June 23, 2020 Tr. at 19:4–15, 25:22–26:11.

59.     Mr. Gaughen testified that he is the Executive Director of the LPPA and that he coordinates the volunteers for signature collection. June 23, 2020 Tr. at 35:15–18, 36:10–17.

60.     Mr. Gaughen testified that there were approximately 190 "adamant" or "super" volunteers for signature collection for the LPPA. June 23, 2020 Tr. at 43:13–44:4, 56:22–24.

61.     Mr. Gaughen further testified that if each of those super volunteers collected five or six valid signatures per week for the remainder of the collection period, the LPPA would be able to collect 5,000 valid signatures. June 23, 2020 Tr. at 57:6–14.

62.     Mr. Scheetz testified that he is the Chairman of the LPPA. June 23, 2020 Tr. at 77:23–25.

63.     Mr. Scheetz testified that he already collected 100 signatures, by himself, this cycle on the 2020 Primary Election day. June 23, 2020 Tr. at 78:19–79:9.

64.     Mr. Scheetz also testified that he had done nothing on Facebook to collect signatures for himself. June 23, 2020 Tr. at 96:2–21.

65.     Mr. Runkle testified that he is the Treasurer of GPPA. June 23, 2020 Tr. at 105:12–17.

66.     Mr. Runkle testified that the GPPA had used its website to solicit possible signatures and signature volunteers, and that 600 individuals had recently signed up to receive further information from the GPPA as a result of that outreach. June 23, 2020 Tr. at 128:9–129:13.

67.     Signature collection by mail and/or e-mail is not something the plaintiffs have engaged in as their testimony suggests that it is cost-prohibitive and has not worked for them in the past. June 23, 2020 Tr. at 9:24–11:13, 83:8–23, 113:4–9, 114:18–115:9, 118:1–8.

68.     The plaintiffs also testified that e-mailing nomination papers to a supporter is not effective as a signor or circulator would still have to print out the papers on legal-sized paper, sign it, and then mail it back to the Political Body. June 23, 2020 Tr. at 88:3–11.

69.      The CPPA offered no testimony or other evidence at the preliminary injunction hearing concerning its signature collection efforts or how many signatures it has already collected.

### E.    The Defendants' and the PADEMS' Testimony

70.    Jason Henry testified that he is the political director for the Pennsylvania Democratic Party. Henry Dep. at 7:6–16.

71.    Mr. Henry testified that a competent signature collection process would use social media to both collect signatures and identify volunteers. Henry Dep. at 26:4–27:3.

72.    Mr. Henry further testified that  be believed a competent signature collection effort on behalf of the plaintiffs could readily collect 5,000 valid signatures from June 25th (the date of his testimony) to August 3rd (the end of the signature collection period). Henry Dep. at 28:22–30:25.

73.    Mr. Henry also testified that large gatherings tend to result in many invalid signatures, compared to targeted signature collection efforts, which result in significantly fewer signatures subject to challenge. Henry Dep. at 65:4–12.

74.    Because Act 77 of 2019 removed the notary requirement, Mr. Henry believes an individual can circulate to himself, his close family and friends, and thereafter mail it to the signature collection network with minimal personal interaction. Henry Dep. at 34:15–36:1.

75.    Mr. Henry testified that across Pennsylvania, businesses have adjusted to provide services under Governor Wolf's executive orders, including sterilizing pens, screening, and using personal protective equipment. Henry Dep. at 36:16–37:22.

76.    Mr. Henry maintains that a competent signature collection effort would adopt the adjustments made by businesses to collect signatures in a safe and effective manner. Henry Dep. at 37:23–38:25.

77.    Mr. Henry further testified that ballot crowding frustrates efforts to inform the electorate on differences among the candidates, places undue emphasis on ballot position, and may

prevent successful candidates from winning a majority. Henry Dep. at 13:18–15:11, 45:4–46:9, 50:6–51:14.

78.    Deputy Secretary Marks, Pennsylvania's commissioner of elections, testified that there would be additional costs, such as when it came to printing, and significant administrative challenges, including maintaining the integrity of multi-page ballots, preventing voter confusion, and ensuring adequate capacity in handicap-accessible devices, if all registered political bodies are permitted to place their candidates' names on the general election ballot automatically, without a showing of a modicum support. June 23, 2020 Tr. at 160:11–162:7.

79.    Deputy Secretary Marks testified that he does not believe what happened two or six or ten years ago in terms of support is relevant to what is going on this year, and if the court granted relief to the plaintiffs in this case, other political bodies would come forward under an equal protection argument, which would lead to an unwieldy number of political bodies on the ballot. June 23, 2020 Tr. at 162:14–163:12.

80.    Deputy Secretary Marks testified that, out of a sense of fairness, the court's February 1, 2018 order in *Constitution Party v. Aichele* has been applied to any Political Body that was seeking to nominate candidates for public office even though the suit was only brought by the same named Political Body plaintiffs as in this case and the order only technically applied to them. June 23, 2020 Tr. at 163:2–12.

### F.    <u>Miscellaneous</u>

81.    Political Bodies had 33 days between February 19, 2020, when signatures were first able to be collected, and March 23, 2020, when the first stay at home order was issued, to collect signatures without concerns about the pandemic being at the forefront.

82.     Political Bodies have 60 days between June 5, 2020, when the last stay at home order was lifted, and the August 3, 2020 deadline to collect signatures.

83.     There are more than 8.5 million registered voters in the Commonwealth of Pennsylvania who are qualified to sign Political Body nomination papers, as any registered voter can sign the nomination papers. June 23, 2020 Tr. at 149:13–23.

## III.     DISCUSSION

### A.     <u>Standard – Motion for a Temporary Restraining Order or Preliminary Injunction</u>

A district court can grant an *ex parte* temporary restraining order where "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. App. P. 65(b)(1)(A). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008); *see also Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ("Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." (citation and internal quotation marks omitted)). The standard for granting a temporary restraining order is the same as that for granting a preliminary injunction. *See Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994). Here, the court treats the motion as a request for preliminary injunction, as the request is no longer *ex parte*, as an evidentiary hearing where all parties presented testimony has been held on the matter.

A district court should not grant a motion for preliminary injunctive relief unless the moving party shows "(1) a likelihood of success on the merits; (2) that [the moving party] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."

*Kos Pharm., Inc.* 369 F.3d at 708 (citing *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158

(3d Cir. 1999)).  Additionally, to obtain a preliminary injunction, the moving party must establish

its entitlement to such relief by clear evidence on the merits of its claim.  *See Winter*, 555 U.S. at

22 (explaining that "a preliminary injunction . . . is . . . an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief").

> Regarding the application of the four factors referenced above,

> a movant for preliminary equitable relief must meet the threshold for the first two
> "most critical" factors: it must demonstrate that it can win on the merits (which
> requires a showing significantly better than negligible but not necessarily more
> likely than not) and that it is more likely than not to suffer irreparable harm in the
> absence of preliminary relief.  If these gateway factors are met, a court then
> considers the remaining two factors and determines in its sound discretion if all
> four factors, taken together, balance in favor of granting the requested preliminary
> relief.  In assessing these factors, Judge Easterbrook's observation bears repeating:
> "How strong a claim on the merits is enough depends on the balance of the harms:
> the more net harm an injunction can prevent, the weaker the plaintiff's claim on the
> merits can be while still supporting some preliminary relief.  [*Hoosier Energy Rural
> Elec. Corp., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)
> (Easterbrook, C.J.).]

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (internal footnotes omitted). Also,

a party's failure to demonstrate a likelihood of success in the litigation ***or*** an irreparable injury

"must necessarily result in the denial of a preliminary injunction." *In re Arthur Treacher's

Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982). Nonetheless, and as indicated above, "there

may be circumstances when the plaintiff satisfies the first two factors, but the balance of the

equities and/or the public interest militate against granting a preliminary injunction." *Fres-co Sys.

USA, Inc. v. Hawkins*, 690 F. App'x 72, 75 (3d Cir. 2017) (citations omitted).

Generally, "[a] primary purpose of a preliminary injunction is maintenance of the status

quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645,

647 (3d Cir. 1994); *see also University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The

20

purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Thus, "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Acierno*, 40 F.3d at 647 (citation omitted).

### B.      Likelihood of Success on the Merits

The plaintiffs allege that given the extraordinary circumstances that have resulted from the COVID-19 pandemic, the signature requirements at issue violate their First Amendment rights, in addition to their rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The Supreme Court has recognized that ballot access laws in general "place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

To evaluate the plaintiffs' claims, the court must determine whether Pennsylvania's petitioning requirements, as applied in the instant case during the COVID-19 pandemic, withstand constitutional scrutiny under the analytic framework the Court established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under this framework, the court must:

> first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789.

When it comes to the character and magnitude of the asserted injury, when a state promulgates a regulation which imposes a "severe" burden on individuals' rights, a court will only uphold the regulation if it is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). In contrast, "reasonable, nondiscriminatory restrictions" are subject to less exacting review. *Id.* (quoting *Anderson*, 460 U.S. at 788–89). "Regulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a 'flexible' analysis, 'weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.'" *Daunt v. Benson*, 956 F.3d 396, 407 (6th Cir. 2020) (quoting *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016)). Therefore, it is essential that the court first determine what level of burden is imposed by the combination of Pennsylvania's strict enforcement of its ballot-access provisions and the stay at home orders and other restrictions issued by the Governor.

While the plaintiffs first argue that they are entitled to relief because Pennsylvania has failed to provide them with any procedure for qualifying for the November 3, 2020 general election ballot, the court finds this is not the case as the ballot access requirements established by the court's February 1, 2018 order in *Constitution Party of Pa*. remain in effect, which gives the plaintiffs a possible way to access the ballot. Therefore, the question becomes what level of burden these ballot access requirements impose on the plaintiffs, in light of the COVID-19 pandemic.

The court finds that the burden on the plaintiffs can be characterized as intermediate, and not as severe as they argue. A burden can be characterized as severe if it works to exclude legitimate candidates from the ballot. *The Constitution Party of Pa. v. Cortes*, 116 F. Supp. 3d 486, 501 (E.D. Pa. 2015), *aff'd sub nom. Constitution Party of Pennsylvania v. Cortes*, 824 F.3d 386

(3d Cir. 2016). Here, none of the stay at home orders precluded the plaintiffs from collecting signatures directly, which is the means for accessing the ballot. Furthermore, Pennsylvania began lifting its stay at home restrictions in May, with all counties in Pennsylvania having their stay at home orders lifted as of June 5, 2020. Additionally, plaintiffs had 33 days to collect signatures prior to the first stay at home order going into effect on March 23, 2020, and the plaintiffs have a full 60 days from June 5, 2020 to August 3, 2020, which is the deadline for signature collection, to meet the requirements imposed by the February 1, 2018 order.

Unlike in cases where district and circuit courts across the country have found there to be severe burdens, the stay at home orders at issue in this case are not in effect through the deadline for candidates to submit their papers for the ballot. The court finds persuasive the Sixth Circuit's ruling in *Thompson v. Dewine*, 959 F.3d 804 (6th Cir. 2020). There the Sixth Circuit clarified a prior ruling in *Esshaki v. Whitmer*, No. 20-1336, 2020 WL 2185553 (6th Cir. May 5, 2020):

> We found a severe burden in *Esshaki* because Michigan's stay-at-home order remained in effect through the deadline to submit ballot-access petitions. Considering all opportunities Plaintiffs had, and still have, to exercise their rights in our calculation of the burden imposed by the State's regulations, *see Mays*, 951 F.3d at 785–86, Plaintiffs' burden is less than severe. Even if Ohio's stay-at-home order had applied to Plaintiffs, the five-week period from Ohio's rescinding of its order until the deadline to submit an initiative petition undermines Plaintiffs' argument that the State has excluded them from the ballot.
>
> . . . There's no reason that Plaintiffs can't advertise their initiatives within the bounds of our current situation, such as through social or traditional media inviting interested electors to contact them and bring the petitions to the electors' homes to sign.

*Thompson*, 959 F.3d at 809.

Similarly, in the instant case, the eight-and-half-week period from the expiration of the stay at home orders in all counties in Pennsylvania to the signature collection deadline undermines the plaintiffs' claims that they are excluded from the ballot and that it would be impossible as a

practical matter for them to collect the required signatures in time. The court also does not find the burden of collecting between 3000 and 5000 signatures during this time period to be severe. *See Thompson*, 959 F.3d at 810 (noting that "just because procuring signatures is now harder . . . doesn't mean that Plaintiffs are *excluded* from the ballot" and holding that intermediate scrutiny applied); *see, e.g.*, *Gottlieb v. Lamont*, No. 3:20-CV-623 (JCH), 2020 WL 3046205, at *3–5 (D. Conn. June 8, 2020) (holding that obtaining 1,028 signatures in 16 days is not "impossible, or virtually impossible, to obtain" even given "the challenges faced by plaintiffs and their staff in light of the COVID-19 pandemic and the various restrictions placed on social interactions"); *Sinner v. Jaeger*, No. 3:20-CV-76, 2020 WL 3244143, at *4 (D.N.D. June 15, 2020) (holding that "North Dakota's in-person petition requirements—considered in totality—cannot impose a severe burden on First Amendment rights as applied . . . when the pandemic will present an obstacle for, at most, one-third of the time statutorily available for signature collection"); *Whitfield v. Thurston*, No. 4:20-CV-466-KGB, 2020 WL 3451692, at *21 (E.D. Ark. June 24, 2020) ("Accordingly, the Court concludes that the State's ballot access requirements, coupled with the State's response to the COVID-19 pandemic, as applied to Mr. Whitfield and Mr. Fults during this election cycle, burdened Mr. Whitfield and Mr. Fults's rights at issue in this litigation. However, on the record evidence before it, the Court determines that, although not trivial, this burden cannot be characterized as severe."); *Libertarian Party of Conn. v. Merrill*, No. 3:20-CV-467 (JCH), 2020 WL 3526922, at *9 (D. Conn. June 27, 2020) ("On the record before it, the court concludes that the moving plaintiffs have failed to make a clear showing that Connecticut's petitioning requirements, as modified by Executive Order 7LL, severely burden plaintiffs' rights. As the figures above demonstrate, in no race is the number of signatures required so high as to virtually exclude a candidate from the ballot."); *Common Sense Party v. Padilla,* No. 2:20-cv-1091-MCE-

EFB, 2020 WL 3491041, at *6 (E.D. Cal. June 26, 2020) ("In context, a short window where in-person solicitation may not have been permitted does not qualify as a 'severe' burden. That said, it also appears to the Court that Plaintiffs essentially abandoned most of their efforts once they ceased utilizing in-person solicitations at the beginning of March.").

While the court acknowledges the realities and the added difficulties on the ground due to the COVID-19 pandemic, the burden on the plaintiffs cannot be properly characterized as severe as it is possible for them to obtain the requisite number of signatures by the deadline. As such, on the present record, the plaintiffs have failed to demonstrate that Pennsylvania's signature requirements are so high amidst the pandemic as to exclude their candidates from the ballot. In reaching this conclusion, the court does not discount the challenges that the plaintiffs, their volunteers, and their staff face given the new normal to which Pennsylvanians are becoming accustomed. Nonetheless, the evidence does not suggest that the plaintiffs are virtually excluded from the ballot.

In the weeks since the stay at home orders expired, Pennsylvania has begun its process of reopening, and in-person signature collection is less burdensome. Furthermore, other methods of signature collection are available to the plaintiffs. While the plaintiffs contend that petitioning for signatures via mail and e-mail is prohibitively expensive and inefficient, the evidence the LPPA plaintiffs presented in this regard is not sufficiently persuasive as it is not based on attempts made during the current election cycle. *See Libertarian Party of Conn.,* 2020 WL 3526922, at *11 ("Both moving plaintiffs contend that petitioning via mail, email, and social media is prohibitively expensive and highly inefficient. However, their evidence is unconvincing. The Libertarian Party plaintiffs, for example, adduce very little evidence based on the actual experiences of its candidates during the current election cycle."). Furthermore, many of the plaintiffs' own witnesses for the

LPPA testified that they have not been using social media as a method of signature collection at all. As Mr. Henry credibly testified, a reasonably diligent candidate would use social media platforms to both collect signatures and identify volunteers. The GPPA's own witness testified that this method has been effective for them, with 600 individuals recently signing up to receive more information from the GPPA because of their website outreach. Moreover, with regard to e-mail, while there may be difficulties in getting viewers to read and not ignore outreach e-mails, the court finds that a diligent candidate even in these times can employ a combination of in-person, mail, e-mail, and social media outreach efforts to collect the requisite amount of signatures needed to qualify for the general election ballot.

Because Pennsylvania in 2019 already eliminated the notarization requirement for signatures, individuals can now circulate petitions to themselves, close family members, and friends, with minimal social interactions. While it is true that the plaintiffs may be harmed in their signature collection efforts by the lack of large public gatherings, the court finds that targeted signature collection, which is often more accurate for obtaining valid signatures, can still take place, and it is possible for the plaintiffs to obtain the requisite number of signatures while using such methods. Additionally, certain events and gatherings throughout the Commonwealth are still taking place and in-person signature collection is possible at these events, as evidenced from Mr. Scheetz's own testimony that he has already collected 100 signatures this cycle, by himself, on the 2020 Primary Election Day.

Based on the testimony and affidavits, the court cannot conclude that it is practically impossible for the plaintiffs to qualify for the ballot, and therefore cannot find the burden on the plaintiffs to be severe. *See Common Sense Party*, 2020 WL 3491041, at *8 ("The stay-at-home orders only prohibited Plaintiffs from conducting in-person solicitation, if at all, for a very short

period of time. Moreover, Plaintiffs have had many months and many options available to attempt to collect the requisite new voter registrations but have nonetheless still failed to do so or to expend any commendable effort toward that end."); *see also Gottlieb*, 2020 WL 3046205, at *6 ("Despite the difficulties that the plaintiffs have encountered in petitioning via these non-traditional means, the court cannot conclude, based on the record before it, that plaintiffs have shown a clear likelihood of success on the issue that their rights have been severely burdened. That is, plaintiffs have not provided sufficient evidence to demonstrate that their inability to obtain the required signatures reflects the near impossibility of meeting the statutory requirements and is not the result of, for example, an insufficient or ineffective effort."). While the court cannot find the burden on the plaintiffs to be severe, the court also does not find the burden to be trivial given the on-the-ground realities of the current situation. Therefore, the proper level of scrutiny to apply is intermediate.

Whether an intermediate burden on the plaintiffs' First and Fourteenth Amendment rights "passes constitutional muster depends on whether the State has legitimate interests to impose the burden that outweigh it." *Thompson*, 959 F.3d at 811–12 (citing *Burdick*, 504 U.S. at 434). Here, the defendants assert that the Commonwealth has legitimate interests in avoiding ballot clustering, ensuring viable candidates, and the orderly and efficient administration of elections. Defs.' Mem. of L. in Opp. to Pls.' Emergency Mot. for TRO and Prelim. Inj. ("Defs.' Mem.") at 11–12, Doc. No. 28. The court agrees that these interests are legitimate and compelling. While the candidates representing political bodies outside the two major parties play an important role, this does not mean these candidates deserve unfettered access to the ballot as the plaintiffs here request by asking the court to completely excuse the signature collection requirements and grant their candidates automatic ballot access. *See Anderson,* 460 U.S. at 788 (holding that "not all restrictions

imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates"). The court finds that an interest in the efficient and fair elections is a compelling state interest. *See Storer v. Brown,* 415 U.S. 724, 730 (1974) (finding "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process").

Furthermore, granting the plaintiffs automatic ballot access would go against the state's interest in ensuring viable candidates that have at least some public support. *See Jenness v. Fortson,* 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."); *see also Whitfield*, 2020 WL 3451692, at *22 ("As significant regulatory interests, Secretary Thurston asserts that the State's ballot access laws prevent frivolous candidacies by ensuring candidates enjoy a modicum of support, reduce voter confusion, and ensure elections are fair, honest, and orderly. The Supreme Court has 'never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access.' Because Arkansas's ballot access scheme does not impose a severe burden as-applied to plaintiffs during this election cycle based on the record evidence before the Court, the Court considers these regulatory interests sufficient to justify a non-severe burden." (internal citations omitted)).

Enforcing a signature collection requirement also furthers the state's interest in an orderly and transparent election process. *See Green Party of Ga. v. Kemp*, 106 F. Supp. 3d 1314, 1318–19

(N.D. Ga. 2015) ("Many states, including Georgia, require prospective third-party or independent candidates to demonstrate that they enjoy some public support. These requirements further the state's interest in creating an efficient and transparent election process." (citation omitted)). As an esteemed judge within this district, the Honorable Mark A. Kearney, held "[t]he Commonwealth's signature-requirement statute reflects the state's valid interest to regulate the manner in which candidates qualify for elections." *Acosta v. Wolf*, Civ. A. No. 20-2528, 2020 WL 3077098, at *4 (E.D. Pa. June 10, 2020). This court is satisfied and specifically holds that Pennsylvania's current signature requirements, even in light of the COVID-19 pandemic, withstand intermediate scrutiny given the Commonwealth's important interest in regulating its own elections.

The court also notes that the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citation omitted); *see also Republican Party of Pa. v. Cortes*, 218 F. Supp. 3d 396, 405 (E.D. Pa. 2016) ("Federal intervention at this late hour risks a disruption in the state electoral process [which] is not to be taken lightly. This important equitable consideration goes to the heart of our notions of federalism." (alteration in original) (citation and internal quotation marks omitted)). Here, although the general election is over three months away, granting the plaintiffs automatic placement on the ballot would be altering state election rules in a way that goes beyond the court's role. *See Libertarian Party of Ill. v. Pritzker*, No. 20-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) ("Suspending entirely the signature requirement without requiring candidates to otherwise demonstrate historical support would, however, extend far beyond these typical variations." (citation omitted)); *see also Fair Maps Nev. v. Cegavske*, No. 3:20-cv-271-MMD-WGC, 2020 WL 2798018, at *16–18 (D. Nev. May 29, 2020) (rejecting plaintiffs' request to allow

for electronic signatures as opposed to in-person signature collection as "[e]ven though there are some five months until the election, rolling out and testing a new electronic system for signature collection and verification between now and then will take some time. Thus, the Court finds the *Purcell* principle applies to the In-Person Requirements despite Plaintiffs' argument there is still plenty of time before the election"). The court also emphasizes its agreement with the Sixth Circuit's key holding in *Esshaki*, "federal courts have no authority to dictate to the States precisely how they should conduct their elections." 2020 WL 2185553, at *2. Therefore, the court finds that the plaintiffs are not likely to succeed on the merits of their claims in asking the court to automatically place their candidates on the ballot.

### C.       Irreparable Harm

Concerning a showing of irreparable harm, "the plaintiff[s] must demonstrate potential harm which cannot be redressed by a legal or equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Thus, to support the granting of a request for a preliminary injunction, the plaintiffs must demonstrate a "clear showing of immediate irreparable injury . . . or a presently existing actual threat; (an injunction) may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law." *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (internal citations and quotations omitted). Here, because the court finds that the plaintiffs are not likely to succeed on the merits of their claims, the courts also finds they are unlikely to suffer an irreparable harm. *See Sinner*, 2020 WL 3244143, at *8 ("Irreparable harm is absent for many of the same reasons that render the Plaintiffs' success on the merits improbable." (citations omitted)). While the plaintiffs presume irreparable harm based on the

alleged violations of their constitutional rights, because no constitutional violations exist, and as it would not be impossible for the plaintiffs to qualify their candidates for the ballot, there is not sufficient harm to the plaintiffs to warrant the entry of a preliminary injunction.

### D.    Balance of Harm/Whether Non-Moving Party Will Suffer Greater Harm

Because the court has determined that the plaintiffs have failed to establish a likelihood of success on the merits or irreparable harm, the court need not address the final two factors because the plaintiffs' failure "must necessarily result in the denial of a preliminary injunction." *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982). Nonetheless, the court briefly addresses the balance of harms and the public interest for the sake of completeness.

Here, it would actually be the Commonwealth, as opposed to the plaintiffs, that would be harmed if the court entered a temporary restraining order or preliminary injunction. This is because enjoining a "[s]tate from conducting [its] elections pursuant to a statute enacted by the Legislature. . . . would seriously and irreparably harm the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (internal footnote omitted). The court finds that serious harm would result if Pennsylvania was not able to conduct is election in accordance with the signature requirements established by the court's February 1, 2018 order, which reflected lawful ballot access requirements. *See Thompson*, 959 F.3d at 812 ("Serious and irreparable harm will thus result if Ohio cannot conduct its election in accordance with its lawfully enacted ballot-access regulations. Comparatively, Plaintiffs have not shown that complying with a law we find is likely constitutional will harm them. So the balance of the equities favors Defendants."); *see also Sinner*, 2020 WL 3244143 at *7–8 ("Enjoining a state from enforcing laws enacted by the people's representatives—and here, constitutional provisions approved by the people themselves—amounts to a well-recognized variant of irreparable injury."). Similarly, in the instant case, the balance of harms favors the defendants as

the plaintiffs have not shown that complying with the signature requirement will constitutionally harm them, but defendants will be harmed by any preliminary injunctive relief.

### E.   Public Interest

Lastly, the court addresses the public interest. The court finds that the public interest is better served by denying the preliminary injunction, as doing so will give effect to the court's February 1, 2018 order, which all parties before the court agree reflects lawful ballot access requirements. Furthermore, the court finds persuasive the Sixth Circuit's reasoning that the public interest "is furthered by protecting the State's constitutionally guaranteed authority and preventing a federal court from usurping a State's legislative authority by re-writing its statutes." *Esshaki*, 2020 WL 2185553, at *2. Here, to grant injunctive relief would be to usurp the ability of the Commonwealth to conduct its own elections in the way it sees fit.

### IV.   CONCLUSION

To obtain a preliminary injunction, the plaintiffs are required to clearly show that they are entitled to this extraordinary remedy. In addition, they have a particularly difficult burden here because they are seeking for the court to alter existing election laws, which the Supreme Court has repeatedly counseled against. Unfortunately, the plaintiffs have not met their high burden as they have not demonstrated that they are likely to succeed on the merits of their claims or that they will suffer irreparable harm absent court relief. Accordingly, the court will deny the motion for a temporary restraining order/preliminary injunction.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.